**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH PENNSYLVANIA**

v.

**CIRCLE, INC.**

**Civ. A. No. 88–837.**

United States District Court, E.D. Louisiana.

Jan. 11, 1990.

Clayton G. Ramsey, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for plaintiff.

John M. Page, Jr. and David S. Kelly, Lemle & Kelleher, New Orleans, La., for defendants Circle, Inc., Grillot Co., Inc. and Cirlot Co.

## MEMORANDUM OPINION

MENTZ, District Judge.

Pursuant to an agreement between the parties, this matter was submitted to the Court for disposition on July 21, 1989. On that date the parties jointly submitted exhibits, depositions and a list of factual stipulations. Each side also presented the Court with a trial memorandum of facts and law.

Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pennsylvania (hereinafter "National Union"), filed its complaint with this Court on February 26, 1988. Jurisdiction is based on diversity of citizenship. In its amended complaint, National Union alleged that the defendants, Circle, Inc., Grillot Co., Inc. and Cirlot Co. (hereinafter collectively referred to as "the assureds"), refused to pay monies that they owed National Union pursuant to a retention premium agreement. On April 21, 1988, the assureds filed their answer denying these allegations and added the affirmative defense of set-off in their amended answer filed June 19, 1989.

The case was originally docketed as a 2–3 day jury trial but the assureds subsequently waived their request for a trial by jury. The parties agreed instead to submit the matter for disposition by the Court as described above.

### Findings of Facts

The pertinent facts in this case are largely uncontested and are contained in the joint stipulation submitted to the Court. The following is a brief summary of these undisputed facts.

1. National Union issued certain general liability, auto and worker's compensation policies to the assureds, effective from December 1, 1979 through December 1, 1982.

2. In connection with the issuance of the aforesaid policies, National Union and the assureds entered into a written agreement whereby the premium for the insurance coverages would be computed and adjusted in accordance with the provisions of the "Retention Premium Agreement–Three Year Plan," (hereinafter "retention agreement").

3. To date the assureds have timely paid $535,173 in premiums for the said policies.

4. On or about September 9, 1980, Willie M. Smith died as a result of a fall which occurred while he was working on board the dredge "Mr. Joe" on the Mississippi River, near Sunshine, Louisiana.

5. As a consequence of the death of Willie M. Smith, his heirs, beneficiaries, representatives and/or survivors commenced a suit for wrongful death/survivor's damages in the United States District Court for the Eastern District of Louisiana, styled "Shirley Louise Smith, etc., et al versus Cirlot Company and National Union Fire Insurance Company, et al," C.A. No. 81–1046, in which suit both National Union and one or more of the assureds were named as defendants.

6. National Union, in the course of the aforesaid *Smith* litigation, engaged three separate counsel to represent its various interests in the case and engaged a fourth to provide a defense to the assureds under a reservation of rights to deny coverage under the policies.

7. In consequence of National Union's reservation of rights, the assureds engaged counsel to represent their interest in the *Smith* litigation and incurred therein $16,556.80 in legal fees and out-of-pocket litigation expenses.

8. In due course and before trial, the *Smith* litigation was compromised and settled and the parties thereto, including the plaintiffs and the defendants, executed a "Receipt and Release" (hereinafter "release agreement"), as drafted by one of National Union's counsel.

9. National Union funded all or a portion of the *Smith* settlement and the assureds contributed no sums to the settlement.

10. On or about July 24, 1980, Bao Van Nguyen, while in the employ of Geosource, Inc. and while working as a welder aboard the D/B SUZY ANN, was fatally injured.

11. As a consequence of the death of Bao Van Nguyen, his heirs, beneficiaries, representatives and/or survivors commenced a suit for wrongful death/survivor's damages in the United States District Court for the Eastern District of Louisiana, styled "Bien Nguyen, et al versus D/B SUZY ANN, et al," C.A. No. 80–4480, in which suit both National Union and the assureds were named as defendants.

12. National Union, in the course of the aforesaid *Nguyen* litigation, engaged its own counsel to represent its interest in the case and engaged separate counsel to provide a defense to the assureds under a reservation of rights to deny coverage under the policies.

13. In consequence of National Union's reservation of rights, the assureds engaged counsel to represent their interest in the *Nguyen* litigation, and incurred therein $21,915.54 in legal fees and out-of-pocket litigation expenses.

14. National Union funded a portion of the *Nguyen* settlement and the assureds contributed approximately $2,000 toward the settlement.

15. In due course and before trial the *Nguyen* litigation was compromised and settled, the plaintiffs therein executing a "Receipt, Release and Indemnity Agreement" in the form drafted by National Union's attorneys.

16. Taking into account the $535,173 in premiums paid by the assureds as set out in paragraph 3, above, and performing the calculations contemplated by the "Retention Premium Agreement–Three Year Plan" based upon the assureds' loss experience under the policies, *including* the assureds' loss experience in the *Smith* case referenced in Paragraphs 4 through 9, above, yields the sum of $280,230, which sum represents the amount of retention premiums claimed herein by National Union from the assureds.

17. Performing the same calculations based on all of the same assumptions as are referenced in Paragraph 16, above, but *excluding* the assureds' "loss experience" in the *Smith* case, yields the sum of $66,116, which sum represents the amount of retention premiums recognized by the assureds to be owed to National Union, but the assureds contend the said $66,116 figure is subject to a further reduction—by way of set-off—for the $21,915.54 in legal fees and out-of-pocket litigation expenses which the assureds incurred in the *Nguyen* matter; National Union does not contest the amount claimed by the assureds as legal fees and out-of-pocket expenses in *Nguyen*, but it does dispute the assureds' right to obtain a set-off against the $66,116 figure.

18. National Union did not pay or reimburse the legal fees or out-of-pocket litigation expenses incurred by the assureds in the *Smith* and *Nguyen* cases as particularized in Paragraphs 7 and 13, above.

19. The assureds were invoiced by National Union for some $280,630 in allegedly due premiums on or about August 29, 1984, but declined to pay on advice of counsel.

## I. The Effect of the Smith Release Agreement on the Retention Agreement

■ The central question that these facts present to the Court is whether National Union may include the "loss experience" of the *Smith* settlement in the computations of their year-end retention agreement with the assureds or whether the language of the *Smith* release agreement prohibits National Union from incorporating the *Smith* "loss" into their calculations.

The assureds contend that National Union may not use the *Smith* "loss" in their retention agreement calculation. They base this on what they consider to be the clear and unambiguous language of the release agreement confected in connection with the settlement of the *Smith* litigation. Both National Union and the assureds were defendants in the Smith case and representatives of each signed the release agreement. The assureds specifically point to the section of the release agreement which reads:

> IT IS UNDERSTOOD AND AGREED that in consideration of the aforesaid sums paid in hand to the plaintiffs, Cirlot Company ... [and] National Union Fire Insurance Company ... do hereby and without limitation release, remise, and forever discharge each and all of the other parties to this Receipt and Release ... from any and all rights, claims, liens, demands, remedies, or causes of action of whatever nature arising out of or in any way connected, either directly or indirectly, with the death of Willie M. Smith ..., including but not limited to ... all other claims and demands, without limitation, which were or could have been made by the parties in the aforementioned proceedings, it being the intention of the undersigned parties to fully settle, compromise, discharge, release

and relinquish any and all claims which they or any of them have or may have against each other as a result of the death of Willie M. Smith....

As stated, the assureds declare that the above language clearly prohibits National Union from applying the *Smith* "loss" to its retention agreement calculations. In support of their position, the assureds rely on the Louisiana Civil Code arts. 2045–2057, inclusive. Articles 2045, 2046, and 2056, however, form the nucleus of their argument.[1] Simply stated, the assureds argue that since the language of the release agreement is "clear and explicit" and leads to no absurd consequences, the Court can search no further than the four corners of the release agreement when interpreting its provisions. La.Civ.Code arts. 2045, 2046. The release agreement states that all parties to that document, plaintiff and defendants herein included, agree to "release, remise, and forever discharge ... all other parties ... from any ... claims ... arising out of or in any way connected, either directly or indirectly, with the death of Willie M. Smith...." The assureds assert that such language is clear and broad enough to encompass National Union's "claim" or use of the *Smith* case "loss" in its retention agreement calculations. Further, the assureds maintain that if the Court finds that the language of the release agreement is not clear and unambiguous, then it still must be interpreted in their favor and against National Union, since agents of National Union drafted the agreement. La.Civ.Code art. 2056.

National Union rebuts these contentions first by stating that this broad interpretation of the release language does, in fact, lead to absurd results. National Union contends that there is no logical reason that it would voluntarily relinquish its contractual right to readjust the assured's in-

---

**1.** La.Civ.Code art. 2045 reads:
 Interpretation of a contract is the determination of the common intent of the parties.
 La.Civ.Code art. 2046 reads:
 When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.

 La.Civ.Code art. 2056 reads:
 In case of doubt that cannot otherwise be resolved, a provision in a contract must be interpreted against the party who furnished its text.
 A contract executed in the standard form of one party must be interpreted, in case of doubt, in favor of the other party.

surance premium as part of the *Smith* settlement and release agreement.

National Union also contends that the assureds' theory amounts to a defense of novation. National Union states that if the Court is to agree with the assureds' interpretation of the effect of the release agreement upon the retention agreement, then the Court must find that the lease agreement constituted a novation to the retention agreement. National Union obviously asserts that the release agreement does not qualify as a novation.

Novation is defined as the "extinguishment of an existing obligation by the substitution of a new one." La.Civ.Code art. 1879. Novation may not be presumed. La. Civ.Code art. 1880. Based on these statutes, National Union argues that the Court may not find that the parties intended to novate the retention agreement absent more explicit language to that effect in the release agreement.

The Court, however, finds the National Union's novation argument misplaced on the facts of the case. The assureds' theory does not amount to a claim of novation. They are not claiming that the retention agreement has been *extinguished* and *substituted* by the release agreement. The assureds are merely claiming that the release agreement modified the retention agreement by the exclusion of the *Smith* "loss" figures from the year-end calculations. When a substantial part of the original performance is still owed, there is no novation. La.Civ.Code art. 1881. That the retention agreement remained substantially intact is consistent with the assureds' theory. Therefore, the Court does not feel that to find for the assureds on this issue we would have to find that the release agreement acted as a novation to the retention agreement.

While the Court is not persuaded by National Union's "novation" argument, we do find that their initial appeal to the Court's experience and common sense is well founded. Louisiana Civil Code art. 2045 et seq. enunciate the principles to be applied in the interpretation of contracts under Louisiana law. As stated previously, art.

2046 states that when contract language is clear and unambiguous and does not lead to absurd consequences, then the Court may look no further than the contract itself to decipher the intent of the parties. In this case, the Court, relying on its experience and familiarity with agreements of the kind before the Court, feels that an interpretation of the language of the release agreement that would prohibit the involvement of the *Smith* "loss" figures in the retention agreement calculations would be an "absurd" contractual interpretation and contrary to the intention of the parties. Further, the language of the release agreement does not leave the Court with an "unresolved doubt" as to the parties' intent such that art. 2056 is invoked.

Instead, the Court feels that art. 2051 is applicable to the release agreement language at issue here. La.Civ.Code art. 2051 states:

> Although a contract is worded in general terms, it must be interpreted to cover only those things it appears the parties intended to include.

Based on the Court's experience and understanding of insurance contracts and settlement agreements, it is inconceivable that a settlement release clause would be intended to affect a retention premium agreement in the manner proposed by the assureds absent explicit language in the release agreement mandating such an effect. It is therefore the holding of this Court that National Union may include the *Smith* "loss" experience in its retention agreement calculations. Accordingly, the assureds owe National Union the sum of $280,230 in retention premiums (See Findings of Fact 16).

## II. *Set-off*

The assureds claim that any amounts that the Court determines they owe under the retention agreement must be set-off by the legal fees and out-of-pocket expenses they incurred in their defense of the *Smith* and *Nguyen* litigations. In each of these cases, National Union engaged its own counsel to represent its interest in the case and engaged separate

counsel to provide a defense to the assureds under a reservation of rights to deny coverage under the policies (See Findings of Fact 6 and 12). In consequence of National Union's reservation of rights, the assureds engaged their own counsel to represent their interest in the *Smith* and *Nguyen* litigation. In doing such, they incurred $16,556.80 in legal fees and out-of-pocket litigation expenses in the *Smith* litigation and $21,915.54 in legal fees and out-of-pocket litigation expenses in the *Nguyen* litigation. (See Findings of Fact 7 and 13).

Under these uncontested facts, Louisiana law does not allow the assureds to recover for the attorneys' fees and out-of-pocket litigation expenses they incurred in engaging separate counsel for their defense in these matters. An insurer has fulfilled its duty to defend in situations where it reserves its right to deny coverage when it employs separate counsel to defend the assured. *Dugas Pest Control v. Mutual Fire, Marine and Inland Ins. Co.*, 504 So.2d 1051, 1054 (La.App. 1st Cir.1987). If the assured engages its own counsel, despite the provision of separate counsel by the insurer, then the assured is not entitled to recover the attorneys' fees and costs incurred—even if the attorney is hired strictly to litigate the coverage issue. *Id.* Since National Union provided separate counsel to the assureds in the *Smith* and *Nguyen* cases, the assureds are not entitled to a set-off for the legal fees and out-of-pocket litigation expenses they incurred by engaging their own counsel.

In view of the foregoing,

IT IS ORDERED that judgment be entered in favor of the plaintiff, National Union Fire Insurance Company of Pittsburgh, Pennsylvania, and against defendants, Circle, Inc., Grillot Co., Inc., and Cirlot Company, in the amount of $280,230.00, plus interest from the date of judicial demand and costs.