NATIONAL UNION FIRE INSURANCE
CO. OF PITTSBURGH, PA.,
Plaintiff–Appellee,

v.

CIRCLE, INC., Grillot Co., Inc., and Cir-
lot Co., Inc., Defendants–Appellants.

No. 90–3136.

United States Court of Appeals,
Fifth Circuit.

Oct. 26, 1990.

David S. Kelly, John M. Page, Jr., Lemle & Kelleher, New Orleans, La., for defendants-appellants.

Margot Mazeau, Clayton G. Ramsey, James B. Kemp, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for plaintiff-appellee.

Before JONES, DUHÉ, and WIENER, Circuit Judges.

PER CURIAM:

Plaintiff-appellee, National Union Fire Insurance Co. of Pittsburgh (National Union), sued defendants-appellants, Circle, Inc.; Grillot Co., Inc.; and Cirlot Co. (the Assureds), under diversity jurisdiction, claiming $280,230.00 in additional insurance premiums based on loss experience. As the basis for rejecting National Union's claim for additional premiums, the Assureds relied on a mutual release with National Union. The Assureds conceded only that they owed $66,116.00 in premiums, against which they claimed an offset for legal fees and out-of-pocket litigation expenses of $21,916.54 incurred when National Union allegedly breached its contractual duty to defend. After a bench trial, the district court rendered judgment for National Union, 731 F.Supp. 750, and the Assureds appealed. We affirm in part and reverse in part and render.

I.

**A. The Retention Premium Agreement and the *Smith* Litigation**

National Union issued certain insurance policies to the Assureds, effective from December 1, 1979 through December 1, 1982. In connection with the issuance of these policies, National Union and the Assureds entered into a written agreement (the Retention Premium Agreement) governing the calculation of the premiums for the insurance coverage. Pursuant to the Retention Premium Agreement, each "loss experience" under the insurance coverage would be used, retroactively, in the calculation of a portion of the premiums to be paid retrospectively. That portion, however, of the premiums was subject to a specified maximum amount or "cap."

In September of 1980, Willie Smith, one of the Assureds' employees, died while working on a dredge. Smith's survivors sued National Union and the Assureds. National Union engaged three separate attorneys to represent its various interests in the case and engaged a fourth attorney to defend the Assureds. In doing so, however, National Union reserved the right to deny coverage under the policies. Because National Union provided counsel under a reservation of rights, the Assureds also engaged counsel to represent their interest in the *Smith* litigation, thereby incurring $16,556.80 in legal fees and out-of-pocket litigation expenses.

In connection with National Union's settlement and payment of the *Smith* claim, all interested parties, including National Union and the Assureds, executed an agreement drafted by National Union and dated January 7, 1983 (the Smith Release Agreement). As part of the Smith Release Agreement, National Union and its Assureds mutually agreed and convenanted as follows:

> [National Union and the Assureds][1] without limitation release, remise, and

1. During oral argument to this court, National Union argued for the first time that the Smith Release Agreement was not between the same parties as the Retention Premium Agreement,

and, therefore, the Smith Release Agreement could not have possibly operated to release unnamed parties from the Retention Premium Agreement. Although the Smith Release Agree-

forever discharge [each other] from any and all rights, claims, liens, demands, remedies, or causes of action of whatever nature arising out of or in any way connected, either directly or indirectly, with the death of Willie M. Smith ... including but not limited to all present and potential cross-claims and third-party demands, for damages, compensation benefits, indemnity, contribution, unjust enrichment, expenses, attorney's fees, incidental costs, and all other claims and demands, without limitation, which were or could have been made by the parties in the aforementioned proceedings, it being the intention of the undersigned parties to fully settle, compromise, discharge, release and relinquish any and all claims which they or any of them have or may have against each other as the result of the death of Willie M. Smith. . . .

National Union ultimately invoiced the Assureds for $280,630 in additional insurance premiums allegedly due under the terms of the Retention Premium Agreement. None of the parties disputes that the *Smith* loss experience was used by National Union in calculating the sum demanded—actually $280,230, and not the slightly larger sum it invoiced. The Assureds refused to pay the premiums as invoiced, contending that the language of the Smith Release Agreement foreclosed National Union's contractual right to use the *Smith* loss experience in calculating the sums due under the Retention Premium Agreement. The Assureds do concede that they owe National Union $66,116 in retention premiums, calculated excluding the *Smith* loss experience, but assert the right to offset $21,915.54 in legal fees and out-of-pocket litigation expenses that the Assureds incurred in connection with the defense of another claim—the *Nguyen* case.

## B. The *Nguyen* Case

After the July 1980 death of Bao Van Nguyen, another of the Assureds' employees, his survivors sued National Union and the Assureds. National Union engaged counsel to represent its interest in the *Nguyen* case and engaged separate counsel to defend the Assureds. In doing so, it reserved the right to deny coverage under the policies. Because National Union engaged separate counsel for the Assureds under a reservation of the right to deny coverage, the Assureds also engaged counsel to represent their interests in the *Nguyen* case and incurred $21,915.54 in legal fees and out-of-pocket litigation expenses— the amount of the offset claimed in this suit.

## C. The District Court's Opinion

The district court, applying Louisiana law to this diversity action, held, "[b]ased on the Court's experience and understanding of insurance contracts and settlement agreements":

1. National Union did not release, by executing the Smith Release Agreement, its right to use the *Smith* loss experience in calculating the premium due under the Retention Premium Agreement; and

2. The Assureds were not entitled to recover (to offset damages) for the attorneys' fees and out-of-pocket litigation expenses that they incurred by engaging separate counsel in the *Nguyen* case because, under Louisiana law, an insurer fulfills its duty to defend when it employs separate counsel to defend the assured, even though the insurer reserves its right to deny coverage.

Rejecting the Assureds claim for offset based on retaining independent counsel in both the *Smith* [2] and *Nguyen* litigation, the district court entered judgment in favor of

---

ment did not name all of the defendants, it was clear that the release was intended to release all of the defendants, and, at any rate, National Union waived this issue by failing to raise it in its brief to this court. Moreover, it was apparent at all times that National Union treated the Smith Release Agreement as binding on the several entities making up the Assureds.

**2.** With respect to the *Smith* litigation, the Assureds did not assert a claim for an offset (except in the alternative) because they recognized that they remitted that claim by their subscription to the Smith Release Agreement.

National Union for $280,230.00, plus interest from the date of judicial demand, and for costs.

## II.

### A. The Smith Release Agreement

#### 1. *The Standard of Review*

 The standard of review for contract interpretation is de novo, *see Gulf Colo. & S.F. Ry. v. Coca-Cola Bottling Co.*, 363 F.2d 465, 467 (5th Cir.1966); but if the interpretation of the contract turns on the consideration of extrinsic evidence, such as evidence of the intent of the parties, the standard of review is clearly erroneous, *see City of Austin v. Decker Coal Co.*, 701 F.2d 420, 425–26 (5th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). If, however, intent is determined solely from the language of the contract, then contractual interpretation is purely a question of law. *See id.* at 427 n. 18. The threshold question whether extrinsic evidence should be considered in determining the intent of the parties is itself a question of law and thus reviewable de novo. *See id.* at 425–26.

The district court relied on its own experience and familiarity with agreements of the kind before it to conclude that for the Smith Release Agreement to prohibit the inclusion of the *Smith* loss figures in the Retention Premium Agreement calculations would be an "absurd" result and contrary to the judicially inferred intention of the parties. Because the district court had no unresolved doubt about the parties' intent, it did not invoke article 2056 of the Louisiana Civil Code, which requires that such unresolved doubt be eliminated by interpreting the contract against the party furnishing its text.

The district court made no express finding of fact as to the intent of the parties. Rather, it based the decision entirely on its own interpretation of the intent of the Smith Release Agreement within its "four corners" and without reference to any extrinsic evidence. Consequently, the district court's interpretation of the release is reviewable de novo as is its decision to look no further than the document itself in determining its meaning.

#### 2. *The Smith Release Agreement Under Louisiana Law*

 Under Louisiana law, a contract is the law between the parties, *see Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698 F.2d 1295, 1312 (5th Cir.1983), and is read for its plain meaning, *see id.* "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code Ann. art. 2046 (West 1987). We agree with the Assureds that the plain meaning of the clear and explicit language of the Smith Release Agreement is that "any and all rights, claims, liens, demands, remedies, or causes of action of whatever nature arising out of or in any way connected, either directly or indirectly, with the death of Willie Smith" includes National Union's contractual right to use the *Smith* loss experience in calculating premiums. We find it inescapable that by executing the Smith Release Agreement, National Union released, inter alia, its right to use the *Smith* loss experience in calculating the premium due under the Retention Premium Agreement. Use of that loss experience is clearly a "right," and it clearly is connected, at least indirectly if not directly, with Smith's death.

National Union argues that it is inconceivable that such broad language in a release agreement arising out of a matter under an insurance policy could be construed to affect an entirely separate contract such as the Retention Premium Agreement, when the release does not specifically mention that agreement. We disagree. "It does not matter that [a party] may not have known of or articulately considered all the possible claims it was relinquishing." *Ingram Corp.*, 698 F.2d at 1312. Thus, we reject National Union's contention that it could not have waived the right to use the *Smith* loss experience in calculating premiums without explicitly referring to the Retention Premium Agreement in the Smith Release Agreement. If

we were to accept the premises that each contract and each occurrence must be named in a mutual release, we would put the draftsman in an untenable position: draft too broadly, and risk missing unnamed matters; draft too narrowly by attempting to list each document and occurrence, and risk missing the inadvertently omitted item under the maxim *inclusio unius est exclusio alterius*. National Union simply cannot draft the broadest possible release and then insist that it does not cover an agreement not named in that release—after all, the insurance policy is not listed either.

National Union makes much of the fact that the Smith Release Agreement was a "standard" release document. Although it contains a number of words that are encountered frequently in such instruments, the Smith Release Agreement is not some universally accepted and acknowledged release agreement. Not only is the Smith Release Agreement language not "standard" to the industry or to the Assureds, it is not even standard to National Union. The Smith Release Agreement language differs markedly from that contained in the *Nguyen* release agreement executed by National Union and the Assureds under similar circumstances. Even if we were to assume, arguendo, that the Smith Release Agreement were unclear or not explicit, it would be unavailing for National Union to argue that the language of that release was standard because Louisiana law requires that any unresolved doubt about the meaning of a contract be eliminated by interpreting the contract against its drafter —here, National Union. *See* La.Civ.Code Ann. art. 2056 (West 1987).

Reading the Smith Release Agreement de novo for its plain meaning, we find that it is not limited to specific contracts, and it could hardly have been drafted in broader, more all-inclusive language. We find, additionally, that the right to use the *Smith* loss experience in calculating the "retro-premium" is one of the innumerable "rights, claims, liens, demands, remedies, or causes of action of whatever nature arising out of or in any way connected, either directly or indirectly, with the death of Willie Smith" from which National Union released the Assureds.

National Union argues that the district court correctly decided that giving unlimited effect to the plain meaning of the Smith Release Agreement would lead to absurd consequences. Specifically, National Union argues that the Assureds' construction of the Smith Release Agreement would require this court to believe that National Union would fund a tremendously expensive settlement on behalf of the Assureds, and then turn around and forgive the Assureds the payment of their premium. It does and we do—but without finding that result to be absurd. It is simply not absurd for a party to release an inchoate and "unquantifiable" (unliquidated) but potentially large claim in exchange for the release of a known but smaller claim. The Assureds contend correctly that to believe that National Union would knowingly release its contractual right to use the *Smith* loss experience in calculating premiums is no more absurd than to believe that the Assureds would knowingly release their own unliquidated claim against National Union for breach of its duty to defend the Assureds in the *Smith* litigation.

National Union insists that releasing a claim in excess of $200,000 in exchange for releasing one of approximately $20,000 is utterly inconceivable. At first glance National Union's argument is appealing, but only if we ignore the validity of the Assureds' argument: when the Smith Release Agreement was executed, none of the parties had any way of knowing how much, if any, of the increase in the premium would be attributable to the *Smith* loss experience. In fact, the extent of the impact of any given payment by National Union on the "retro-premium" was contingent upon the Assureds' loss experience in all other claims under the subject coverages for the policy period in question. And because the Retention Premium Agreement carried a cap or maximum, the *Smith* loss experience might not have affected the retention premium calculation at all. Thus, *at the time the release was executed,* the ultimate disparity between the increase in pre-

miums attributable to the *Smith* case loss experience and the Assureds' claim for National Union's breach of its duty to defend was not only unknown, but also unknowable.

Contrary to National Union's contention and the district court's conclusion, we find that the consequences of the Smith Release Agreement were not "absurd" when that the release was entered into for at least two reasons. First, although releasing the right to use a loss experience in the calculation of premiums may have proved to be an unwise business decision, interpreting a release to mean that a party intended to do just that is not "absurd." Although a business decision may be unwise, imprudent, risky, or speculative, it is not necessarily "absurd." We decline to allow contracting parties to escape the unfortunate and unexpected, though not objectively "absurd," consequences of a contract by subsequently characterizing their consequences as "absurd." Second, unless the release is interpreted to foreclose National Union's right to use the *Smith* loss experience in the premium calculation, National Union would not be giving anything at all (nor would the Assureds be getting anything at all) in exchange for the Assureds' release of all claims against National Union, including those for out-of-pocket litigation expenses and attorneys' fees incurred in connection with the *Smith* litigation.

We find that the district court erred as a matter of law in deciding, "[b]ased on the court's own experience and understanding of insurance contracts and settlement agreements," that the Smith Release Agreement did not foreclose National Union's right to use the *Smith* loss experience in calculating the premiums due under the Retention Premium Agreement. We do not reach the question of the subjective intent of the parties because the language of the Smith Release Agreement is clear and explicit, and does not lead to absurd consequences.[3]

## B. The *Nguyen* Case

■ National Union's insurance policies with the Assureds obligated National Union to defend the Assureds against any suit claiming damages resulting from risks covered under the policies. Nguyen's survivors sued the Assureds and National Union, and the latter provided separate counsel to defend the Assureds. It did so under a reservation of the right to deny coverage and to refuse to indemnify the Assureds. The Assureds state that because National Union reserved the right to deny coverage and because the Assureds questioned the adequacy of the legal defense that National Union provided, the Assureds hired their own attorneys to represent their interests in the *Nguyen* case. Assuming the veracity of those statements, the Assureds are not necessarily entitled to recover their legal expenses. We agree, however, with National Union's contention that an insurer does not automatically breach its duty to defend merely because it reserves the right to deny coverage under the policy. An insurer that elects to reserve its rights to deny coverage may nevertheless discharge its contractual obligation to defend its insured by engaging separate counsel to represent the insured; and an insurer that does so is not obliged to reimburse the costs and legal fees incurred by an insured in contesting the coverage issues. *See Dugas Pest Control, Inc. v. Mutual Fire, Marine & Inland Ins. Co.*, 504 So.2d 1051, 1054 (La.Ct.App.1987).

■ Because the duty to defend encompasses an obligation to do so vigorously and adequately, *see Cousins v. State Farm Mut. Auto. Ins. Co.*, 294 So.2d 272, 275 (La.Ct.App.), *writ ref'd*, 296 So.2d 837 (La. 1974), the Assureds still could state a claim based on National Union's breach of its duty to defend them if they could prove that the separate counsel provided by National Union was objectively inadequate. The Assureds, however, introduced no credible evidence to suggest that the sepa-

---

**3.** Although the point is not at issue in this case, we may never know whether the parties adverted to the Retention Premium Agreement in executing the Smith Release Agreement. When, as here, the language within the "four corners" of the instrument is clear and explicit, the objective intent of the parties is inferred from that language.

rate counsel provided by National Union fell short of this duty. In fact, the only evidence of inadequacy in the record consists of self-serving, purely subjective testimony about the Assureds' perception of inadequacy. The Assureds conceded that they had no other evidence of the inadequacy, and they all but admitted the insufficiency of their evidence. We find that the district judge was not clearly erroneous in rejecting the Assureds' claim for an offset in the amount of the *Nguyen* litigation expenses.

C. Interest from the Date of Judicial Demand

 The Assureds argue that the district court should have awarded interest from the date of judgment, not from the date of judicial demand. They argue that Louisiana jurisprudence permits such an award only for claims that are fixed and definitive, not for claims like this one that became fixed only upon judgment. We do not read the cases or the Louisiana Civil Code that way. "[L]egal interest is due *at least from the date of judicial demand* on a claim for damages arising out of breach of contract, regardless of whether the precise amount of the claim is unliquidated, disputed or not ascertainable with certainty at the time suit is filed." *Mini Togs Prods., Inc. v. Wallace,* 513 So.2d 867, 875 (La.App.) (emphasis added), *writ denied,* 515 So.2d 447, 515 So.2d 451 (La.1987); *see also Road Constr., Inc. v. Canal Indem. Co.,* 538 So.2d 625, 627–28 (La.Ct.App.1988) (quoting extensively from the reasoning in *Mini–Togs* ). Indeed, a claim arising out of a breach of contract, whether liquidated or not, bears legal interest from the date of judicial demand or from such earlier date when the claim became ascertainable and due. *See Mini Togs,* 513 So.2d at 873–75 (citing *Alexander v. Burroughs Corp.,* 359 So.2d 607 (La.1978)). In this case, because a good faith justiciable controversy existed about the amount of additional premiums due, the amount due under the Retention Premium Agreement was not "liquidated," i.e., not fixed or ascertainable. Therefore an award of interest from the date that the retrospective premium was due would not

be proper. The award of interest from the date of judicial demand, however, was proper.

For the foregoing reasons, we affirm the parts of the district court's judgment that reject the Assureds' claim for an offset for the out-of-pocket litigation expenses that the Assureds incurred in connection with the *Nguyen* litigation, and that award National Union interest from the date of judicial demand; we reverse the part of the district court's order that awards judgment of $280,230.00 to National Union; and we render judgment of $66,116.00 for National Union, plus legal interest from the date of judicial demand until paid in full, with National Union to bear half of the costs of court and the Assureds to bear the other half.

AFFIRMED IN PART, REVERSED IN PART AND RENDERED.