# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-10353

EAGLE TX I SPE, L.L.C., doing business as Eagle Lone Star I SPE, L.L.C.,

>  Plaintiff - Appellant

v.

SHARIF & MUNIR ENTERPRISES, INCORPORATED; RAMSEY M. MUNIR,

>  Defendants - Appellees

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2015

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:13-CV-2565

Before DAVIS, WIENER, and HAYNES, Circuit Judges.

PER CURIAM:*

Plaintiff-Appellant Eagle TX I SPE, LLC d/b/a Eagle Lone Star I SPE, LLC ("Eagle") brought this action under diversity jurisdiction to enforce four secured promissory notes (collectively, "the Notes") against Defendants-Appellees Sharif & Munir Enterprises, Inc. ("SME"), as primary obligor on the Notes, and Ramsey Munir, as guarantor of the Notes (collectively,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-10353

"Defendants"). Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. Although there is complete diversity of citizenship between Eagle on the one hand and SME and Munir on the other, Defendants argued that the true party in interest is a partnership between Eagle and the Federal Deposit Insurance Corporation ("FDIC"), whose status as partner destroys diversity jurisdiction. Based primarily on its interpretation of certain contracts between the FDIC and Eagle's predecessor-in-interest, the district court concluded that a partnership exists and thus destroys diversity jurisdiction.

For the reasons set forth below, we conclude that there is no partnership between the FDIC and Eagle and that diversity jurisdiction therefore exists, so we reverse and remand this action.

## I.    BACKGROUND

This action arises out of four secured promissory notes executed between 2005 and 2008 by SME in favor of Colonial Bank ("Colonial").[1] In addition to SME's other security, Munir guaranteed all four Notes. In exchange for the Notes, Colonial issued loans to SME.

In 2009 Colonial failed, and the FDIC became its receiver. Branch Banking & Trust Company ("BB&T") acquired certain of Colonial's assets and liabilities, including the Notes, from the FDIC, through a purchase and assumption agreement ("PAA"), which included a loss-sharing agreement ("LSA").[2] In 2011 BB&T assigned all of its right, title, and interest in the Notes and associated documents to Eagle. BB&T is also related to Eagle: BB&T is

---

[1] Unless otherwise noted, the undisputed facts in this section come from the district court's opinion. *See Eagle TX I SPE LLC v. Sharif & Munir Enterprises, Inc.,* No. 3:13-CV-2565-O, 2014 WL 696523 (N.D. Tex. Feb. 24, 2014).

[2] The agreement is titled Commercial Shared-Loss Agreement in the PAA, but we will refer to it as the LSA for consistency with the usage of the district court and the parties.

No. 14-10353

the sole member of Eagle SPE, LLC, which in turn is the sole member of Eagle. The parties apparently agree that Eagle stepped into BB&T's shoes with respect to the PAA and LSA, but we will continue to refer to BB&T for consistency with the language of the agreements and the district court's opinion.

Eagle alleges SME defaulted on the Notes and failed to cure the delinquency after Eagle gave notice of the delinquency and announced its intent to pursue legal remedies. Eagle eventually foreclosed on the property put up as collateral for the Notes but failed to recover the full amount of the indebtedness.

On July 3, 2013, Eagle sued Defendants for the amount of the deficiency plus interest—a total of approximately $1.5 million—in federal court, asserting diversity jurisdiction under 28 U.S.C. § 1332(a). In the complaint, Eagle asserted that both it and its jurisdictionally relevant associated entities, Eagle SPE, LLC and BB&T, are all citizens of North Carolina and that both Defendants are citizens of Texas. SME and Munir have not contested these assertions. Thus, if we were looking only at the parties in the complaint, there would be diversity jurisdiction under 28 U.S.C. § 1332(a) because the parties are completely diverse and the amount in controversy exceeds $75,000.

Defendants filed a motion to dismiss, arguing that complete diversity does not exist because BB&T (and thus Eagle) had entered into a partnership with the FDIC under the PAA and LSA, and the partnership is the real party in interest. Because "the citizenship of a partnership is determined by reference to the citizenship of each of its partners,"[3] and because the FDIC, like other federally-chartered corporations, is a diversity-destroying "stateless"

---

[3] *Int'l Paper Co. v. Denkmann Assocs.*, 116 F.3d 134, 137 (5th Cir. 1997).

entity,[4] a partnership between the FDIC and Eagle would destroy complete diversity.

The district court explained that, because Defendants offered "evidentiary materials outside of the pleadings," their motion to dismiss under Rule 12(b)(1) constituted a "factual attack" upon the complaint, which "challenges the facts on which jurisdiction depends and allows a court to consider matters outside of the pleadings, such as affidavits, testimony, or other evidentiary materials."[5] As the district court noted, "[w]hen a defendant makes a factual attack 'no presumptive truthfulness attaches to plaintiff's allegations.'"[6] Thus, to determine the relationship between BB&T and the FDIC, the district court examined the PAA; the LSA; a Form 8-K filed by BB&T with the Securities and Exchange Commission ("SEC") on August 14, 2009; and a few documents from the FDIC's website.

The district court applied Texas partnership law, which, under Tex. Bus. Orgs. Code Ann. § 152.052, primarily looks to five non-exclusive factors which might "indicat[e] that persons have created a partnership":

> (1) receipt or right to receive a share of profits of the business;
> (2) expression of an intent to be partners in the business;
> (3) participation or right to participate in control of the business;
> (4) agreement to share or sharing:

---

[4] 2014 WL 696523, at *3 (citing *Lehman Bros. Bank, FSB v. Frank T. Yoder Mortg.*, 415 F. Supp. 2d 636, 639-41 (E.D. Va. 2006); *Iceland Seafood Corp. v. Nat'l Consumer Co-op. Bank*, 285 F. Supp. 2d 719, 26 (E.D. Va. 2003); *Little League Baseball, Inc. v. Welsh Pub. Grp., Inc.*, 874 F. Supp. 648, 651 (M.D. Pa. 1995); *Fed. Deposit Ins. Corp. v. Nat'l Sur. Corp.*, 345 F. Supp. 885, 887 (S.D. Iowa 1972); *Banks of the Ozarks v. IS Motel Corp.*, No. 4:12–cv–0024–HLM, 2012 WL 1134733, at *2 (N.D. Ga. Apr.2, 2012))

[5] *Id.* at *2-3 (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981); *Sierra Club v. Energy Future Holdings Corp.*, 921 F. Supp. 2d 674, 678 (W.D. Tex. 2013)).

[6] *Id.* at *2 (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981) (citation omitted)).

No. 14-10353

(A) losses of the business; or
 (B) liability for claims by third parties against
the business; and
(5) agreement to contribute or contributing money or
property to the business.[7]

The district court concluded that the FDIC and BB&T did not share profits, that they had not expressed an intent to be partners, and that the FDIC contributed no money or property to the alleged partnership. Nevertheless, the district court concluded that the FDIC and BB&T are partners primarily because the district court interpreted the PAA and LSA to give the FDIC "control over BB&T's administration, management, and collection of the subject assets . . . more than mere 'input' into the operation of the business or control over administrative tasks."[8] The district court also found that the FDIC and BB&T agreed to share losses, a fact that Eagle does not dispute.[9]

For the reasons set out below, we conclude that the district court erred in interpreting the PAA and LSA with respect to the FDIC's control over the business, and that the sole factor potentially indicating a partnership under Texas law—the sharing of losses—is insufficient to create a partnership under these circumstances.

## II.   APPLICABLE LAW

In this challenge under Rule 12(b)(1), the district court was able to weigh the evidence before it, and we review its findings of fact for clear error,[10] but we review the legal conclusions based on those facts de novo.[11] If subject matter jurisdiction is determined by interpretation of a contract, as it is in this case,

---

[7] TEX. BUS. ORGS. CODE ANN. § 152.052(a) (West 2006).

[8] 2014 WL 696523 at *7-10.

[9] *Id.* at *10.

10 *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005).

[11] *Funeral Consumers Alliance, Inc. v. Serv. Corp. Intn'l*, 695 F.3d 330, 336 (5th Cir. 2012).

the interpretation is typically reviewed de novo,[12] unless the interpretation depends on extrinsic evidence, in which case we review the district court's findings for clear error.[13]

Jurisdiction in this case turns on whether the relationship between BB&T and the FDIC qualifies as a partnership under the five-factor partnership test established by Tex. Bus. Orgs. Code Ann. § 152.052, set out above. The test set out under section 152.052, which applies to partnerships purportedly created on or after January 1, 2006, uses the same five factors set out under the now expired Texas Revised Partnership Act ("TRPA"), which applied to partnerships purportedly formed between January 1, 1994, and December 31, 2005.[14] Thus, we may look for guidance to cases interpreting TRPA, including *Ingram v. Deere*, 288 S.W.3d 886 (Tex. 2009).

The Texas Supreme Court noted in *Ingram* that the common law required proof of all five factors, but "TRPA contemplates a less formalistic and more practical approach to recognizing the formation of a partnership."[15] In contrast to the common law approach, TRPA did not require "direct proof of the parties' intent to form a partnership," proof of all factors, or sharing of profits in order to prove the existence of a partnership. "Still, . . . the traditional import of sharing profits as well as control over the business will probably continue to be the most important factors."[16]

Most relevant to this action, the Court also discussed the difficulty in applying the current test:

---

[12] *See UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 215 (5th Cir. 2009); *City of Austin, Tex. v. Decker Coal Co.*, 701 F.2d 420, 425 (5th Cir. 1983).

[13] *Nat'l Union Fire Ins. Co. v. Circle, Inc.*, 915 F.2d 986, 989 (5th Cir. 1990).

[14] *See Malone v. Patel*, 397 S.W.3d 658, 670 n.4 (Tex. Ct. App. 2012).

[15] 288 S.W.3d at 895.

[16] *Id.* at 896 (citations omitted). The court also noted that "TRPA recognizes that sharing of losses may be indicative of a partnership arrangement but . . . is 'not necessary to create a partnership.'" *Id.* (citation omitted). Section 152.052(c) contains the same provision.

> We note the difficulty of uniformly applying a totality-of-the-circumstances test . . . , but we cannot ignore the Legislature's decision to codify the essential common law partnership factors in TRPA without specifying that proof of all or some of the factors is required to establish a partnership. Yet, we can provide additional guidelines for this analysis. Of course, an absence of any evidence of the factors will preclude the recognition of a partnership under Texas law. *Even conclusive evidence of only one factor normally will be insufficient to establish the existence of a partnership.* To hold otherwise would create a probability that some business owners would be legally required to share profits with individuals or be held liable for the actions of individuals who were neither treated as nor intended to be partners. The Legislature does not indicate that it intended to spring surprise or accidental partnerships on independent business persons, if, for example, an employee is paid out of business profits with no other indicia of a de facto partnership under TRPA. On the other end of the spectrum, conclusive evidence of all of the TRPA factors will establish the existence of a partnership as a matter of law. The challenge of the totality-of-the-circumstances test will be its application between these two points on the continuum.[17]

A Texas appellate court explained that it is possible to determine as a matter of law whether or not a partnership exists at the "two poles" of the continuum: (a) when all five factors are present or (b) when no factor or only one factor is present.[18] With this framework in mind, we turn now to the partnership determination.

---

[17] *Id.* at 898 (emphasis added) (citation omitted).

[18] *Rojas v. Duarte,* 393 S.W.3d 837, 841 (Tex. Ct. App. 2012) (citations to *Ingram* omitted).

## III.   PARTNERSHIP FACTORS

As noted above, the district court determined that three of the section 152.052 factors were absent: the sharing of profits, expression of the intent to be partners, and contribution of money or property to the purported partnership. It concluded that only two factors are present—the FDIC's control over the business and the sharing of losses. We address each factor below in the order presented in section 152.052.

### A.    Profit Sharing

The first section 152.052 factor is the "receipt or right to receive a share of profits of the business." The district court concluded that there was no profit-sharing arrangement after examining not only the PAA and LSA to determine whether or not the FDIC and BB&T agreed to share profits but also BB&T's 8-K and a "Loss Share Questions and Answers" page from the FDIC's website.[19] We need not go beyond the language of the agreements.

Under the PAA, BB&T acquired assets from the FDIC (as Colonial's receiver) in hopes of recovering money from third parties, as Eagle is trying to do on the Notes in this case. Neither the PAA nor LSA say anything about BB&T sharing any profits (i.e., recovery in excess of what BB&T paid for an asset) with the FDIC.

Defendants argue that the LSA establishes profit-sharing through provisions that require BB&T to repay certain funds to the FDIC. The LSA does not support that interpretation. Article II of the LSA provides that if BB&T takes a loss on assets it acquired, the FDIC will reimburse BB&T 80% of the loss up to $5 billion, but if BB&T recovers on assets for which it received a reimbursement, BB&T must then repay the FDIC for the reimbursement. The LSA concerns only the sharing of losses; it has nothing to do with profits.

---

[19] 2014 WL 696523, at *5-6.

No. 14-10353

Thus, we agree with the district court that there is no evidence of profit-sharing under the PAA and LSA.

## B.    Expression of Intent to Be Partners

The district court found that the FDIC and BB&T did not express the intent to be partners in the legal sense, notwithstanding the use of the word "partners" in a press release regarding the FDIC's loss-sharing program.[20] We agree.

## C.    Control

The third section 152.052 factor is the "participation or right to participate in control of the business," and it is the most important issue in this appeal. The district court set out the correct legal standards for finding control under Texas law. The district court reiterated that control, "like the sharing of profits, has been traditionally viewed as one of the most important factors in determining the existence of a partnership."[21] In *Ingram*, the Texas Supreme Court explained that "[t]he right to control a business is the right to make executive decisions." The district court cited further rules from Texas cases:

> Facts that may indicate the right to control the business include "exercising authority over the business's operations, the right to write checks on the business's checking account, control over and access to the business's books, and receiving and managing all of the business's assets and monies." Texas courts have noted, however, that mere input into the operations of the business does not constitute evidence of a right to control the business. Furthermore, performing administrative tasks for the business does

---

[20] *Id.* at *6-7.

[21] *Id.* at *7 (citing *Westside Wrecker Serv., Inc. v. Skafi*, 361 S.W.3d 153, 171 (Tex. Ct. App. 2011)).

No. 14-10353

not evidence a party's control over the operations of
the business.[22]

Although the district court set out the correct standards under Texas
law, it misinterpreted the PAA and LSA's provisions granting the FDIC certain
oversight authority and erroneously concluded that the FDIC had control over
BB&T's business.

First, as the district court conceded, "Much of the language in the PAA
and LSA evidence an intent to sell and transfer outright all of the FDIC's
interest in the subject assets."[23] By way of example, the district court quoted
from Article 3.1 of the PAA, which provides that BB&T "purchases from the
[FDIC], and the [FDIC] hereby sells, assigns, transfers, conveys, and delivers
to [BB&T], all right, title, and interest of the [FDIC] in and to all of the
assets . . . ."[24] The district court also noted that another district court has
concluded that the FDIC did not form a joint venture with a private company
through an LSA which used identical language.[25]

Despite acknowledging correctly that the PAA and LSA effected a total
transfer of assets from BB&T, the district court concluded that the agreements
nevertheless gave the FDIC enough control to rise to the level of a partnership.

First, the district court found significant the PAA's requirement that
BB&T "preserve and maintain *for the joint benefit* of the [FDIC] . . . and
[BB&T], all Records of which it has custody for such period as . . . the [FDIC]
. . . *in its discretion* may require . . . ."[26] It cited other provisions requiring

---

[22] *Id.* (citations omitted) (*see Sewing v. Bowman*, 371 S.W.3d 321, 334 (Tex. Ct. App. 2012); *Rojas*, 393 S.W.3d at 841; *Knowles v. Wright*, 288 S.W.3d 136, 147 (Tex. Ct. App. 2009); and *Big Easy Cajun Corp. v. Dall. Galleria Ltd.*, 293 S.W.3d 345, 349 (Tex. Ct. App. 2009)).

[23] *Id.* at *8.

[24] *Id.*

[25] *Id.* (citing *Bank of the Ozarks v. IS Motel Corp.*, No. 4:12-CV-0024-HLM, 2012 WL 1134733 (N.D. Ga. Apr. 2, 2012)).

[26] *Id.* at *8 (quoting PAA).

10

No. 14-10353

BB&T to keep books and provide auditor reports to allow the FDIC to determine BB&T's compliance with the PAA and LSA.[27]

Second, the district court reasoned that the standards of care required of BB&T under the PAA and LSA are similar to standards of care for partners under Texas law,[28] such as the duty to act in good faith and the duties of loyalty and care. It based this conclusion on the LSA's requirement that BB&T obtain FDIC approval before entering into a transaction with one of BB&T's affiliates and before taking any action to the detriment of transferred assets, as well as the LSA's requirement that BB&T exercise "best business judgment" and use its "best efforts to maximize collections."[29]

Third and finally, the district court found that "the PAA and LSA provide the FDIC with the right to exercise authority over BB&T's administration, management, and collection of subject assets" even though "the FDIC does not conduct the day-to-day affairs of the business" because BB&T is required to "collaborate" with the FDIC.[30] Specifically:

> The terms of the LSA provide the FDIC with explicit authority over the operation of the business. Under the LSA, the FDIC need not make a payment to BB&T if the FDIC determines that the charge-off "should not have been effected by [BB&T]." The FDIC may require BB&T to assign, transfer, and convey any asset back to the FDIC if the FDIC "determines in its discretion that [BB&T] [are] not diligently pursuing collection efforts . . . ." The LSA requires BB&T to prioritize its management and collection efforts, stating that BB&T must "use [its] best efforts to maximize collections with respect to [subject assets] . . . without regard to the effect of maximizing collections on [non-subject assets] . . . ." Additionally, BB&T are prohibited from

---

[27] *Id.*
[28] *Id.* at \*9.
[29] *Id.*
[30] *Id.*

11

No. 14-10353

> assigning or transferring their rights under the LSA without the FDIC's prior written consent, which can be withheld in the FDIC's "sole discretion." Moreover, the LSA provides that BB&T must reimburse the FDIC for any recoveries made on the subject assets. Furthermore, the LSA states that BB&T are "responsible to the [FDIC] . . . in the performance of its duties." Under the terms of the LSA, the FDIC has authority to oversee and control how BB&T manages, collects, and recovers the subject assets—what Plaintiff refers to as "the core functions of the business."[31]

We conclude that these provisions, whether viewed in isolation or together, do not rise to partnership-level control under Texas law. Rather, they grant the FDIC reasonable oversight to ensure that BB&T carries out the contracts entered into by two unrelated entities.

All of the provisions must be interpreted in the context of the full PAA and LSA. The purpose of the agreements is to ensure that BB&T maximizes recovery on the transferred assets, not because the FDIC will share in the profits (as established above, it cannot) but because any loss realized by BB&T will be borne largely by the FDIC through the 80% reimbursement provision.

It is significant that the provisions the district court focused on are all intended to limit the FDIC's potential downside due to BB&T's fault. First, because the FDIC is required to pay 80% of covered losses, it is no surprise that it would want the ability to access and audit BB&T's books. The LSA specifically states that the purpose of this oversight is to determine compliance with the agreements.

Second, we do not agree that the standards of care under the PAA and LSA are equivalent to a partner's standard of care under Texas law. The

---

[31] *Id.* (citations and footnotes omitted).

No. 14-10353

standards set out in the PAA and LSA are all intended to limit the FDIC's liability under the 80% reimbursement scheme, not establish an across-the-board fiduciary duty. The provisions requiring BB&T to obtain approval before entering into a transaction with a BB&T affiliate or taking an action which would reduce the value of a subject asset are limited requirements that would help prevent the FDIC from having to reimburse BB&T for a loss caused by BB&T's own actions. Similarly, the "best business judgment" and "best efforts to maximize collections" language does not necessarily signify a partnership obligation because similar duties are also found in contracts between non-partners.[32] The LSA is silent as to how BB&T is to carry out any profit-making activity.

If the PAA and LSA actually created a partnership, the law would supply broad standards of care. There would be no need to set out the specific—and more limited—restrictions found in the PAA and LSA. These contractual provisions are useful precisely because they are the only source of a duty.

Finally, all of the provisions cited by the district court supposedly establishing the FDIC's control over BB&T's everyday operations are, like the other oversight provisions, merely intended to limit the FDIC's liability under the 80% reimbursement scheme. The FDIC never exercised control over BB&T's profits, only BB&T's actions which might lead to a loss for which the FDIC would be 80% liable. The FDIC could refuse payment if it determined

---

[32] *See, e.g.*, *Moreno v. Summit Mortg. Corp.*, 364 F.3d 574, 575 (5th Cir. 2004) (under certain conditions, one mortgage company was required to use best efforts to close a loan and sell it to a separate mortgage company); *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 289 (Tex. Ct. App. 2009) (bank agreed to use best efforts to secure loan approval and commitment letter for a customer).

that BB&T should not have taken a loss; it could require BB&T to transfer an asset back to the FDIC if BB&T was not diligently pursuing collection efforts; and it could refuse to allow BB&T to assign or transfer its rights under the LSA. All of these provisions are designed to limit the FDIC's exposure as much as possible while granting BB&T free rein to manage its day-to-day affairs as it sees fit.

Examining the PAA and LSA closely, we cannot find the requisite level of control to indicate a partnership. The FDIC no longer owns any of the subject assets and cannot receive any of the profits from BB&T's sales, but it is required to reimburse BB&T 80% of any loss. The oversight and protective provisions in favor of the FDIC left BB&T relatively free to run its day-to-day affairs *profitably* however it wished but gave the FDIC the ability to protect itself from unnecessary losses caused by BB&T. Those provisions do not signify a partnership but rather a prudent contract. In sum, the PAA and LSA do not grant the FDIC the right to make executive decisions over BB&T's day-to-day operations.

Thus, we conclude that the district court erred as a matter of law in interpreting the PAA and LSA to find control. This factor is not present here.

### D.    Sharing of Losses

The PAA and LSA explicitly agreed to share losses. Thus, this factor is present.

### E.    Contribution of Money or Property

It is uncontested that the FDIC never contributed money or property to the business, so this factor is not met.

### F.    Conclusion

We agree with the district court's determination that the FDIC and BB&T did not share profits, that they did not express an intent to be partners,

and that the FDIC did not contribute money or property to the purported partnership. We also agree that the FDIC and BB&T agreed to share losses. Contrary to the district court, we conclude, as a matter of law, that the PAA and LSA did not grant the FDIC partnership-level control over BB&T's business.

Thus, the only partnership factor present here is the sharing of losses. Under Texas law, "[e]ven conclusive evidence of only one factor normally will be insufficient to establish the existence of a partnership."[33] Texas law treats "sharing profits as well as control over the business" as "probably . . . the most important factors."[34] The sharing of losses is an ambiguous factor which is not a hallmark of partnership formation under Texas law. We therefore conclude that there is no partnership between the FDIC and BB&T as a matter of law and that Eagle necessarily is the only proper party plaintiff to this suit. Because complete diversity exists between the proper parties to this suit and the amount in controversy exceeds $75,000, there is diversity jurisdiction under 28 U.S.C. § 1332(a).

## IV.    CONCLUSION

For the reasons set forth above, we conclude that there is no partnership between Eagle and the FDIC and that complete diversity therefore exists in this action. Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.

---

[33] *Ingram*, 288 S.W.3d at 904.
[34] *Id.* at 896.