# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 24, 2012

No. 11-30576

Lyle W. Cayce
Clerk

PETROHAWK PROPERTIES, L.P.,

Plaintiff - Appellant  Cross-Appellee

v.

CHESAPEAKE LOUISIANA, L.P.,

Defendant - Appellee  Cross-Appellant

LEE WELDON STOCKMAN; PATSY BISON STOCKMAN,

Defendants - Appellees

Appeals from the United States District Court
for the Western District of Louisiana

Before KING, HIGGINBOTHAM, and HIGGINSON, Circuit Judges.

KING, Circuit Judge:

What follows is the tale of competing mineral leases on the Louisiana property of Lee and Patsy Stockman during the Haynesville Shale leasing frenzy. In April 2008, the Stockmans entered into an extension of their mineral lease with Chesapeake Louisiana, L.P. and received a $240,000 bonus. In May 2008, the Stockmans entered into a mineral lease with Petrohawk Properties, L.P. for a $1.45 million bonus. In July 2008, Petrohawk dishonored the $1.45 million draft and executed a second mineral lease with the Stockmans, paying

No. 11-30576

them a $1.7 million bonus. Chesapeake sued the Stockmans for breach of contract, and the parties settled at trial. The Stockmans then sued Petrohawk for fraud in obtaining the first mineral lease, and Chesapeake sued Petrohawk for intentional interference with its contract with the Stockmans. Petrohawk prayed for a judgment that its mineral lease was valid or, in the alternative, for a return of its bonus money. After a bench trial, the district court found that Petrohawk procured the first mineral lease by fraud and rescinded the lease. The district court dismissed Chesapeake's tort claim and dismissed Petrohawk's claim for a return of its bonus money. Petrohawk appealed, and Chesapeake cross-appealed. For the following reasons, we AFFIRM the judgment of the district court.

## I. BACKGROUND

*A. Statement of Facts*

Lee and Patsy Stockman (the "Stockmans") own real property in Caddo Parish, Louisiana (the "Stockman property"). On July 14, 2005, the Stockmans entered into a mineral lease with Stellios Exploration Company (the "Stellios Lease"), which was later assigned to Chesapeake Louisiana, L.P. ("Chesapeake"). The primary term of the Stellios Lease expired on July 14, 2008, and the Stellios Lease did not contain an option to extend the primary term. However, the Stellios Lease provided that the lease could be maintained beyond the primary term by conducting drilling operations on the leased premises. On April 9, 2008, Chesapeake and the Stockmans executed an extension of the Stellios Lease (the "Chesapeake Extension"). Chesapeake tendered to the Stockmans a draft for the lease bonus of $500 per acre, which amounted to $241,430. Chesapeake did not immediately record the Chesapeake Extension.

On May 8, 2008, Lisa Broomfield ("Broomfield") approached the Stockmans about leasing their property to Petrohawk Properties, L.P. ("Petrohawk"). Broomfield was a landman working for Pangaea Land Services

2

No. 11-30576

("Pangaea") on behalf of its client, Petrohawk. Lee Stockman ("Mr. Stockman") informed Broomfield that he had already signed the Chesapeake Extension. Broomfield responded that the Chesapeake Extension was not "legal or valid" because Chesapeake had not yet recorded it. Broomfield explained that Louisiana was a race state and that if Petrohawk recorded its lease first, the Chesapeake Extension would be invalid. Broomfield did not tell Mr. Stockman that the Chesapeake Extension would still be valid as to the Stockmans regardless of recordation and that the Stockmans could be liable to Chesapeake for breaching the obligation of good faith if they signed a competing lease with Petrohawk. She offered the Stockmans a lease bonus of $3,000 per acre for a mineral lease with Petrohawk, which amounted to $1.45 million.

After speaking with Broomfield, Mr. Stockman called his neighbor, who was a retired geologist and had experience with mineral leases. The neighbor gave Mr. Stockman the following language to include in the lease: "This lease is executed [without] warranty of title, either expressed or implied, not even as to the return of bonus money or any other payments." That evening, Broomfield sent an email to her supervisor stating that the Stockmans had already signed the Chesapeake Extension. She explained that Mr. Stockman "realizes that if [Petrohawk does not] win the race to the courthouse he is stuck with $500 per acre." Furthermore, she stated that Mr. Stockman requested a lease bonus of $3,500 per acre and the inclusion of both vertical and horizontal Pugh clauses in the lease. Broomfield also testified that Mr. Stockman had requested a three-year primary term with a two-year option to extend.

On May 9, 2008, Broomfield returned to the Stockmans' residence with a lease for them to sign. The lease contained different terms than those that Broomfield and Mr. Stockman had negotiated the day before: a $3,000 per acre bonus payment, no Pugh clauses, and a primary term of five years. Broomfield testified that the lease was intended as a "placeholder" in order for Petrohawk

3

No. 11-30576

to win the race to the courthouse. Mr. Stockman asked Broomfield to include his neighbor's language expressly excluding any warranty of title. Broomfield called her supervisors, who allowed the Stockmans to strike through the warranty of title in the lease. Broomfield assured Mr. Stockman that striking the warranty would have the same effect as including his neighbor's language. The Stockmans then signed and executed the mineral lease with Petrohawk (the "May 9 Lease"). Petrohawk tendered to the Stockmans a draft for the lease bonus (the "Petrohawk draft") in the amount of $1.45 million and payable in thirty days. That same day, Petrohawk recorded the May 9 Lease. Chesapeake did not record the Chesapeake Extension until May 19, 2008.

On May 12, 2008, before depositing the Petrohawk draft, Mr. Stockman went to the clerk of court's office to ensure that Broomfield was correct that the Chesapeake Extension was unrecorded. The clerk of court showed Mr. Stockman that the Chesapeake Extension was unrecorded and confirmed that Louisiana is a race state. After this investigation, Mr. Stockman deposited the Petrohawk draft. Mr. Stockman wanted to return Chesapeake's bonus money, and in late May or early June, he paid an attorney to write a letter to Chesapeake. The attorney drafted the June 2, 2008 letter, which revoked and withdrew the Stockmans' consent to the Chesapeake Extension and contained a cashier's check in the amount of Chesapeake's bonus payment.

The Petrohawk draft was due to be paid to the Stockmans on July 2, 2008, but the Stellios Lease was not set to expire until July 14, 2008. If Petrohawk honored the $1.45 million draft on July 2, and Chesapeake commenced operations on the Stockman property before the expiration of the Stellios Lease, then Chesapeake would maintain the Stellios Lease and Petrohawk would lose its bonus payment. Thus, Petrohawk intentionally dishonored the Petrohawk draft, which was returned to Mr. Stockman unpaid on July 7, 2008.

4

No. 11-30576

Mr. Stockman called Petrohawk to find out why the draft was dishonored. He spoke with Todd Bergeron ("Bergeron"), who explained that Petrohawk's lawyers had advised Petrohawk not to pay the bonus until July 15, when it could be confirmed that Chesapeake had not extended the Stellios Lease. Bergeron led Mr. Stockman to believe that either party could walk away from the May 9 Lease, but that if Mr. Stockman did so, he would not receive the $1.45 million bonus. Bergeron did not tell Mr. Stockman that he was legally entitled to payment of the Petrohawk draft. Bergeron told Mr. Stockman that if he allowed a delay in payment until July 15, Petrohawk would increase the bonus.

Thereafter, the Stockmans and Petrohawk executed a new lease on July 15, 2008 (the "July 15 Lease"). Petrohawk agreed to pay the Stockmans a lease bonus of $3,500 per acre, or $1.7 million. The July 15 Lease, which was entitled "Amendment of Oil, Gas and Mineral Lease," contained a new description of the Stockman property, a primary term of three years, a two-year option to extend, and horizontal and vertical Pugh clauses. Apart from these provisions, the July 15 Lease incorporated by reference the other provisions of the May 9 Lease. That same day, Petrohawk made a $1.7 million wire transfer to the Stockmans. Petrohawk recorded the July 15 Lease on August 26, 2008.

## B. Statement of Proceedings

On September 3, 2008, Chesapeake filed a complaint against the Stockmans in federal district court, asserting, *inter alia*, a breach of contract claim. The Stockmans denied liability, maintaining that they had revoked their consent to the Chesapeake Extension through the June 2, 2008 letter and the return of the bonus payment. On July 1, 2009, the district court permitted Petrohawk to intervene in the action. However, on August 5, 2009, the district court severed Petrohawk's intervenor complaint, creating the instant action. In the fall of 2009, the district court held a two-day bench trial in the action

No. 11-30576

between Chesapeake and the Stockmans.  Before the court ruled on the merits of the action, Chesapeake settled with the Stockmans.

In its intervenor complaint, Petrohawk sought a declaratory judgment that the May 9 Lease is valid and takes precedence over the Chesapeake Extension. Chesapeake filed an answer and counterclaim seeking a declaratory judgment that the Chesapeake Extension primes the May 9 Lease.  Chesapeake also asserted that Petrohawk deliberately induced the Stockmans to breach the Chesapeake Extension.  The Stockmans filed an answer and counterclaim against Petrohawk, alleging that the May 9 Lease is null and void because Petrohawk procured their consent by fraud.  The Stockmans also presented two alternative arguments: (1) that the May 9 Lease is null and void for failure of consideration; and (2) that the May 9 Lease was novated by the July 15 Lease. Petrohawk filed an answer and alternative counterclaim against the Stockmans, seeking the return of its lease bonus if the May 9 Lease is rescinded or novated.

Petrohawk filed a motion to dismiss, which was converted into a motion for summary judgment, seeking the dismissal of Chesapeake's claims. Chesapeake and the Stockmans each filed motions for summary judgment.  On August 4, 2010, the district court denied the Stockmans' and Chesapeake's motions for summary judgment.  The court granted in part Petrohawk's motion for summary judgment, holding that the May 9 Lease primes the Chesapeake Extension because the May 9 Lease was recorded first.  The court denied the remainder of Petrohawk's summary judgment motion.[1]

Beginning on November 30, 2010, the district court held a three-day bench trial.  At the start of the trial, the court clarified the issues to be tried: (1) the

---

[1] The district court granted Chesapeake's motion to realign the parties, such that "Chesapeake and the Stockmans [are] considered the plaintiffs and . . . Petrohawk [is] deemed the defendant."  The court stated, however, that "[f]or the benefit of the clerk of court and the parties, . . . the caption of the case will not change."

Stockmans' claims for fraud, failure of consideration, and novation; (2) Chesapeake's claim for intentional interference with a contract; (3) Petrohawk's prayer for judgment declaring the May 9 Lease to be in full force and effect; and (4) Petrohawk's alternative counterclaim for a return of the lease bonus if the May 9 Lease is rescinded or novated. The court heard testimony from Mr. Stockman, Broomfield, and Bergeron, among others. On December 2, after hearing all of the testimony, the district court made preliminary oral findings on the record, including that the May 9 Lease was procured by fraud. The court then engaged in a colloquy with the parties' lawyers regarding various issues, such as whether the Stockmans confirmed the fraud. The court found that Mr. Stockman did not confirm the fraud by signing the July 15 Lease. The court ordered post-trial briefing on the issue of the return of the lease bonus and stated that a written ruling would be forthcoming.

On May 27, 2011, the district court issued its written Ruling on the Merits. The court first noted that it was bound by *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), to apply Louisiana law. Turning to the Stockmans' claim for fraud, the court found that "Petrohawk (through its agents Pang[a]ea and Lisa Broomfield) was in a frenzy to get the [May 9 Lease] . . . [and was] willing to say or do anything to obtain it." The court found that Broomfield made affirmative misrepresentations to Mr. Stockman: she "kept using the terms 'valid' and 'invalid', which led Mr. Stockman to reasonably . . . believe that, upon the filing of the [May 9 Lease], the Chesapeake [E]xtension would be invalid." The court found that "Mr. Stockman's reliance on Ms. Broomfield's statements, in light of all the circumstances, was reasonable." The court stated that Mr. Stockman's "action in going to the clerk's office to make sure that the Chesapeake [E]xtension had not been filed makes it more credible that Mr. Stockman believed what he had been told [by Broomfield]." The court concluded that "the [May 9 Lease] would [not] have been signed by Mr. and Mrs. Stockman had they

not been led to believe that the unrecorded Chesapeake [E]xtension would be invalid upon the recording of the [May 9 Lease]."

The court concluded that Petrohawk obtained the May 9 Lease by fraud and rescinded the May 9 Lease. The court stated that it did not need to reach the issues of consideration or novation. The court declined to award damages to the Stockmans, but it did order Petrohawk to pay the Stockmans reasonable attorney's fees and to "pay the costs associated in correcting the public records to strike the [May 9 Lease]." Next, the court dismissed with prejudice Chesapeake's claim for intentional interference with a contract. The court explained that, under the elements of the claim from the Restatement of Torts, "Petrohawk would be liable to Chesapeake," but noted that Louisiana law does not follow the Restatement.

The court then dismissed with prejudice Petrohawk's counterclaim for the return of its bonus money. The court reiterated that it had rescinded the May 9 Lease and noted that, under Article 2033 of the Louisiana Civil Code, the "parties must be restored to the situation that existed before the contract was made." However, the court explained that the bonus money was not paid for the May 9 Lease, but "was a higher amount negotiated between the Stockmans and Petrohawk in exchange for the delay in payment [until July 15]." The court determined that the July 15 Lease is "sufficient to stand on its own while incorporating the contents of the [May 9 Lease]." The court determined that the July 15 Lease incorporated the May 9 Lease's exclusion of the warranty of title.

The district court issued its judgment on June 27, 2011. Petrohawk appealed the court's judgment, and Chesapeake cross-appealed. On September 26, 2011, the district court granted the Stockmans' motion for attorney's fees in the amount of $34,013. Petrohawk filed an amended notice of appeal.[2]

---

[2] Petrohawk does not address on appeal the issue of the district court's award of attorney's fees, and thus we will not address this issue. *See United States v. Whitfield*, 590

No. 11-30576

## II. DISCUSSION

*A. Applicable Law and Standard of Review*

When jurisdiction is based on diversity, we apply the substantive law of the forum state. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). Thus, in the instant case, we apply Louisiana law. "To determine Louisiana law, we look to the final decisions of Louisiana's highest court." *Holt*, 627 F.3d at 191 (citation omitted). "In the absence of a final decision by that court addressing the issue at hand, a federal court must determine, in its best judgment, how the state's highest court would resolve the issue if presented with it." *Id.* (citation omitted).

On appeal from a bench trial, we review a district court's conclusions of law and mixed questions of law and fact de novo. *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009). We review a district court's findings of fact for clear error. *Id.* "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2011) (citation and internal quotation marks omitted). The clearly erroneous standard is met "only if we have a definite and firm conviction that a mistake has been committed." *Id.* (citation and internal quotation marks omitted).

*B. The Stockmans' Fraud Claim*

*1. Louisiana Law on Contractual Fraud*

Pursuant to the Louisiana Civil Code, a "contract is formed by the consent of the parties established through offer and acceptance." LA. CIV. CODE ANN. art. 1927. However, "[c]onsent may be vitiated by error, fraud, or duress." LA. CIV. CODE ANN. art. 1948. "Fraud is a misrepresentation or a suppression of the

___

F.3d 325, 346 (5th Cir. 2009) ("[A] party waives any argument that it fails to brief on appeal.") (citations omitted).

truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." LA. CIV. CODE ANN. art. 1953. "Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill." LA. CIV. CODE ANN. art. 1954. "Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent." LA. CIV. CODE ANN. art. 1955.

Under Louisiana law, an action for fraud against a party to a contract requires: (1) "a misrepresentation, suppression, or omission of true information"; (2) "the intent to obtain an unjust advantage or to cause damage or inconvenience to another"; and (3) that the error induced by the fraudulent act relates to a circumstance that substantially influenced the victim's consent to the contract. *Shelton v. Standard/700 Assocs.*, 798 So. 2d 60, 64 (La. 2001). "Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." LA. CIV. CODE ANN. art. 1957.

*2. Analysis*

In the instant case, the district court concluded that Petrohawk procured the May 9 Lease by fraud. The court found that Broomfield misrepresented to Mr. Stockman that, upon the recordation of the May 9 Lease, the Chesapeake Extension would be invalid. The court found that the Stockmans reasonably relied on Broomfield's misrepresentations and that they would not have signed the May 9 Lease had they known that her statements were false. On appeal, Petrohawk argues that the elements of fraud were not met in this case. Petrohawk asserts that: "(1) there was no misrepresentation of fact, only a statement of law or opinion; (2) there was no intent to defraud or deceive the Stockmans; (3) Mr. Stockman conducted his own investigation and did not rely on what Mrs. Broomfield said; and (4) the truth about the legal opinion on

recordation in Louisiana was easily ascertainable and Mr. Stockman is presumed to know the law." We address each of Petrohawk's arguments in turn.

First, Petrohawk maintains that there was no misrepresentation of fact to support the district court's finding of fraud. Petrohawk contends that, pursuant to Louisiana law, fraud cannot be based on an opinion statement or a misrepresentation of law. Petrohawk asserts that Broomfield's statements regarding the validity of the Chesapeake Extension were simply her own opinions or statements of law and therefore "cannot be fraudulent." We reject Petrohawk's argument that Broomfield's statements were simply her opinions. In *American Guaranty Co. v. Sunset Realty & Planting Co.,* 23 So. 2d 409 (La. 1945) (on rehearing), the Louisiana Supreme Court stated that "[w]henever a person states a matter which might otherwise be only an opinion, not as a mere expression of his own opinion, but as an existing fact, material to the transaction, the statement clearly becomes a statement of fact and not an expression of opinion." *Id.* at 449 (citations omitted). Here, Broomfield's misrepresentations to Mr. Stockman were made as statements of fact in order to assure Mr. Stockman that he could legally sign the May 9 Lease with Petrohawk. Thus, her statements could form the basis of a fraud claim.[3]

Furthermore, we reject Petrohawk's argument that a misrepresentation of law cannot give rise to a fraud claim. Under Louisiana law, the relevant inquiry is whether there was "a misrepresentation, suppression, or omission of *true information.*" *Shelton,* 798 So. 2d at 64 (emphasis added). Indeed, Louisiana courts have found fraud where the underlying false statement was a

---

[3] Petrohawk additionally asserts that no fraud was committed because Broomfield's statements were not wholly false, as she was correct that the first lease to be recorded is the valid lease from a third party's perspective. We reject this argument. The Louisiana Supreme Court has stated that "[o]ne conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth." *Am. Guar. Co.,* 23 So. 2d at 456 (citation and internal quotation marks omitted).

misrepresentation of law.  For example, in *Lupo v. Lupo*, 475 So. 2d 402 (La. Ct. App. 1985), a lawyer had his client sign an appeal bond and assured him that, by signing the bond, he would not "have any [legal] problems."  *Id.* at 404-05.  The lawyer did not tell his client that the bond "would act as a mortgage on his property."  *Id.* at 404.  The court concluded that the lawyer "perpetrated fraud upon [the client]. [The lawyer] needed an appeal bond, of a substantial sum, and by making misrepresentations, and by failing to disclose pertinent information, he obtained one."  *Id.* at 405; *see also Mack v. Evans*, 804 So. 2d 730, 733 (La. Ct. App. 2001) (affirming the trial court's finding of fraud based on a misrepresentation of law, where the defendant "had misled [the plaintiff] to believe it was necessary for her to donate her interest in the real estate in order to qualify for supplemental security income benefits").

Second, Petrohawk argues that there is no factual basis to support a finding that Petrohawk intended to defraud the Stockmans.  Petrohawk asserts that the record is "completely devoid of any evidence that Mrs. Broomfield knew that what she told Mr. Stockman about the legal effect of recordation was false."  We reject Petrohawk's argument, as there is evidence in the record that supports Petrohawk's intent to defraud the Stockmans.  Broomfield testified that she was an experienced landman and former paralegal who was very knowledgeable about Louisiana real estate and contract law.  She testified that she even had to advise Pangaea's attorney on Louisiana law.  This testimony indicates that Broomfield knew that she was lying to Mr. Stockman about the validity of the Chesapeake Extension.  Additionally, the district court found that Petrohawk was in a frenzy to get the May 9 Lease and was "willing to say or do anything to obtain it."  Documentary evidence and testimony support this finding.  For example, emails sent between Broomfield and her supervisor in early May indicate that Petrohawk was frantic to get the lease signed.  Also, Broomfield testified that the May 9 Lease was signed in a hurry "[t]o tie the acreage up."

She conceded that Petrohawk wanted the lease as "a placeholder" and that she "was told to get it signed, get it to the courthouse, and that's what [she] did." Finally, during their initial meeting Broomfield encouraged Mr. Stockman to consult with an attorney, but when Mr. Stockman subsequently raised legal concerns relating to his signing of the Chesapeake Extension, Broomfield told him, "don't worry about it, Petrohawk ha[s] an office full of lawyers."

Third, Petrohawk argues that the Stockmans' fraud claim fails because Mr. Stockman relied on the results of his own investigation and not on Broomfield's misrepresentations. Petrohawk points to the following facts to demonstrate Mr. Stockman's investigation: (1) his consultation of his neighbor; (2) his investigation at the clerk of court's office; and (3) his procurement of legal counsel. We reject Petrohawk's argument. The district court's finding that Mr. Stockman relied on Broomfield's misrepresentations is not clearly erroneous. With regard to the consultation of his neighbor, the evidence indicates that the neighbor did not provide any legal advice to the Stockmans regarding the legal effect of recordation on the validity of leases. With respect to his investigation at the clerk's office, the evidence indicates that Mr. Stockman only confirmed what Broomfield had told him—that the Chesapeake Extension was unrecorded. This fact indeed highlights Mr. Stockman's reliance on her statements. With regard to the hiring of a lawyer, the evidence indicates that Mr. Stockman hired a lawyer to write the revocation letter to Chesapeake, which occurred only *after* the signing of the May 9 Lease. Thus, the record evidence supports the district court's finding that Mr. Stockman relied on Broomfield's statements.

Fourth, Petrohawk asserts that the fraud claim fails because the truth was readily and reasonably ascertainable by the Stockmans. Petrohawk stresses that Mr. Stockman had access to legal advice, "but failed to exercise that minimum amount of diligence." Under Article 1954 of the Louisiana Civil Code, fraud does not vitiate consent when the complaining party "could have

ascertained the truth without difficulty, inconvenience, or special skill." When "a fraudulent misrepresentation can be easily uncovered," the complaining party will be expected to exercise this minimum amount of diligence. Saul Litvinoff, *Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion*, 50 LA. L. REV. 1, 69 (1989). However, when uncovering the truth requires "familiarity with peculiar technicalities, which calls for a special skill," the complaining party "cannot be blamed for lack of diligence." *Id.* Furthermore, in determining the diligence of the complaining party, "[s]ubjective aspects such as a party's business experience or professional capacity must be taken into account." *Id.*

In the instant case, the fraudulent misrepresentation at issue concerned the legal effect of recordation on the validity of a mineral lease. Ascertaining the truth of the statement required special legal skill, and Mr. Stockman was a mere landowner who did not possess the requisite legal skills to uncover the truth. Mr. Stockman's only likely avenue to uncovering the truth was by consulting a knowledgeable attorney—which would have entailed difficulty and inconvenience. Thus, we reject Petrohawk's argument that Mr. Stockman could have easily ascertained the truth. In conclusion, we affirm the district court's judgment finding that Petrohawk obtained the May 9 Lease by fraud.

## C. Confirmation of the Fraud

### 1. Louisiana Law on Confirmation

"A contract is relatively null . . . when a party . . . did not give free consent at the time the contract was made," such as when there was fraud in the inducement of the contract. LA. CIV. CODE ANN. art. 2031. "A contract that is only relatively null may be confirmed." *Id.*; *see* Litvinoff, *Vices of Consent*, 50 LA. L. REV. at 9-10 ("[S]ince vices or defects are susceptible of being cured, when a vice involves the consent of a party it gives rise to a nullity that is only relative, which means that it may be cured . . . through confirmation by the party of interest . . . ."). "Confirmation is a declaration whereby a person cures the

relative nullity of an obligation." LA. CIV. CODE ANN. art. 1842. "An express act of confirmation must contain or identify the substance of the obligation and evidence the intention to cure its relative nullity." *Id.* "Tacit confirmation may result from voluntary performance of the obligation." *Id.*

*2. Analysis*

On appeal, Petrohawk argues that district court erred in failing to find that the Stockmans confirmed the fraud through their subsequent actions. As evidence of the Stockmans' confirmation, Petrohawk points to (1) their June 2, 2008 revocation letter and (2) their acceptance of payment for the July 15 Lease. Petrohawk contends that their confirmation renders the May 9 Lease valid. The Stockmans respond that they did not confirm the fraud because they were not aware of the fraud until the trial with Chesapeake in the fall of 2009.

In its Ruling on the Merits, the district court did not address the issue of confirmation. However, because the court found that Petrohawk procured the May 9 Lease by fraud and then rescinded the May 9 Lease, the court impliedly determined that the Stockmans did not confirm the fraud.[4] This implied finding is supported not only by the court's general disposition of the case, but also by the court's statements during the colloquy at trial. *See Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 724 & n.2 (5th Cir. 1961) (relying on a district court's comments in colloquy because they were consistent with the court's judgment and shed light on a finding of fact not explicitly made in the court's written findings). Regarding the issue of confirmation, the court stated, "I do not believe that the Stockmans confirmed the May 9 [Lease]." The court stated that

---

[4] "If a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court impliedly made a finding consistent with its general holding so long as the implied finding is supported by the evidence." *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (citations omitted); *see* 9C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2579 (3d ed.) ("In some cases if the court fails to make a finding on a particular fact it has been assumed that . . . it impliedly made a finding consistent with its general disposition of the case.") (footnotes omitted).

"I find as a matter of fact [Mr. Stockman] did not . . . give a declaration that he was trying to cure a relative nullity when he signed on July 15."

As a preliminary matter, we must decide whether actual or constructive knowledge is required for confirmation of a relative nullity under Louisiana law. Petrohawk contends that the standard should be constructive knowledge, while the Stockmans assert that actual knowledge of the vice is required. Under Louisiana law, when a party confirms a relative nullity, the party gives up the right to bring an action for that nullity. 5 SAUL LITVINOFF, LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 12.54 (2d ed.). Therefore, the Louisiana courts have held that an act of confirmation "must evince [the] intention [to confirm] clearly and unequivocally." *Rahier v. Rester*, 11 So. 2d 87, 92 (La. Ct. App. 1942) (citation and internal quotation marks omitted). In his treatise on Louisiana civil law, Professor Saul Litvinoff stated that, with respect to express confirmation, "it is necessary that the act [of confirmation] evidence that the confirming party acted with *knowledge of the vice* or defect that invalidates the act to be confirmed, and with a *deliberate will* of curing that vice or defect." THE LAW OF OBLIGATIONS § 12.54 (emphases added). With respect to tacit confirmation, he stated that "the act of performance must be *voluntary* . . . which means . . . that it must be rendered with knowledge of the vice or defect that made the obligation null." *Id.* § 12.56 (emphasis in original). Given that the confirming party relinquishes a cause of action and must intend to cure the vice, we conclude that confirmation under Louisiana law requires actual knowledge of the vice.

Petrohawk argues that, even if actual knowledge is required, the Stockmans knew of and confirmed the fraud by the time they signed the July 15 Lease. We reject Petrohawk's argument. The record evidence indicates that the district court found that Mr. Stockman did not know of the fraud until the Chesapeake trial in 2009. At trial, the district court stated that "[Mr. Stockman]

testified that until he sat in this courtroom [for the Chesapeake trial], he did not know that he had been lied to." The court concluded that Mr. Stockman "never really had all the evidence until he sat in this courtroom [in 2009]." Furthermore, during the colloquy, the court found that, at the time of the signing of the July 15 Lease, Mr. Stockman was "still operating under the belief and hope that the information he had been given [by Broomfield] was . . . correct." This finding of fact is based on a credibility determination, which is for the district court to make. *See French*, 637 F.3d at 577 ("[This court] must give due regard to the district court's credibility evaluations."). There is no reason to disturb the court's finding, as Petrohawk has not demonstrated it to be clearly erroneous.

Given the district court's finding that Mr. Stockman did not have actual knowledge of the fraud until 2009, neither the Stockmans' June 2, 2008 letter nor their acceptance of payment for the July 15 Lease constitutes an act of confirmation. Thus, the district court did not err in finding that the Stockmans did not confirm the fraud. We affirm the district court's judgment rescinding the May 9 Lease, awarding attorney's fees and costs to the Stockmans, and ordering Petrohawk to pay the costs of striking the May 9 Lease from the public records.

*D. Petrohawk's Counterclaim for a Return of the Lease Bonus*

In its Ruling on the Merits, the district court concluded that Petrohawk was not entitled to a return of its lease bonus. The court determined that the July 15 Lease was a stand-alone lease and that it incorporated by reference the exclusion of the warranty of title from the May 9 Lease. The court thus concluded that the July 15 Lease did not contain an implied warranty of title.

On appeal, Petrohawk maintains that the July 15 Lease is either an amendment to or a novation of the May 9 Lease, and under either scenario, it is entitled to a return of the bonus. If the July 15 Lease is an amendment, Petrohawk asserts that the rescission of the May 9 Lease requires the rescission

17

of the July 15 Lease and therefore a return of the bonus under Article 2033 of the Louisiana Civil Code.[5]  If the July 15 Lease is a novation (or a new lease that extinguishes the obligations of the May 9 Lease), Petrohawk contends that it is entitled to a return of the bonus pursuant to an implied warranty of title, as the July 15 Lease does not contain an exclusion of the express warranty clause.

In order to assess Petrohawk's arguments on appeal, we must first review the district court's determination that the July 15 Lease is a stand-alone lease, and not merely an amendment to the May 9 Lease.  If the interpretation of a contract is "determined solely from the language of the contract," we review the district court's interpretation de novo.  *Nat'l Union Fire Ins. Co. v. Circle, Inc.*, 915 F.2d 986, 989 (5th Cir. 1990) (citation omitted).  If the interpretation of a contract turns on extrinsic evidence, we review a district court's determination under the clearly erroneous standard.  *Id.* (citation omitted).

Under Louisiana law, the "[i]nterpretation of a contract is the determination of the common intent of the parties." LA. CIV. CODE ANN. art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046.  Thus, when the contract is not ambiguous, the court "lacks the authority to look beyond the four corners of the document." *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 386 (5th Cir. 2001) (citation omitted).  However, if the contract is ambiguous, then the court may look to extrinsic evidence to determine the parties' intent.  *See Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 286 (5th Cir. 2009) (citing *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002)).  "A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on the issue, its written terms are susceptible to more than one interpretation, there is

_____

[5] Article 2033 provides that, when a contract is rescinded for a relative nullity, "[t]he parties must be restored to the situation that existed before the contract was made."

No. 11-30576

uncertainty as to its provisions, or the parties' intent cannot be ascertained from the language used." *Carmichael v. Bass P'ship*, No. CA 12-10, 2012 WL 1525083, at \*3 (La. Ct. App. 2012) (citation and internal quotation marks omitted). "The determination of whether a contract is clear or ambiguous is a question of law." *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 590 (La. 2007).

We conclude that the district court did not err in determining that the July 15 Lease was a stand-alone lease. Looking at the face of the document, the July 15 Lease is a complete contract in and of itself, and not a mere modification of an existing contract. The July 15 Lease contains "letting language," which states: "Lessor . . . grants, leases, and lets to Lessee and Lessee's successors and assigns the above-described lands for the primary term . . . ." This letting language is used when granting a new lease and thus indicates that the July 15 Lease was meant to stand on its own. The July 15 Lease also contains the main provisions of a mineral lease: a description of the leased property, a reference to adequate consideration, and a primary term. Rather than simply amending the May 9 Lease, the July 15 Lease incorporated by reference many provisions from the May 9 Lease to form a complete contract. The four corners of the July 15 Lease indicate that it is a stand-alone lease.

We next address Petrohawk's argument that there is an implied warranty of title in the July 15 Lease that requires the return of the lease bonus. Petrohawk concedes that the May 9 Lease contains an express exclusion of the warranty of title, but contends that the July 15 Lease does not contain such an exclusion. However, Petrohawk fails to note that the July 15 Lease contains a valid incorporation by reference provision. *See Action Fin. Corp. v. Nichols*, 180 So. 2d 81, 83 (La. Ct. App. 1965) ("[T]he jurisprudence is clear that documents may be incorporated in contracts by attachment or reference thereto. . . . [These writings] become a part of the agreement between the parties with the same force and effect as if the provisions had been contained in the basic

19

contract . . . ."). According to the July 15 Lease's incorporation provision, all of the provisions contained in the May 9 Lease are incorporated into the July 15 Lease—apart from the provisions regarding the property description, the primary term, the option to extend, and the Pugh clauses. Thus, based on the incorporation provision, the exclusion of the warranty of title in the May 9 Lease is incorporated into the July 15 Lease. Accordingly, there is no implied warranty of title in the July 15 Lease, and Petrohawk is therefore not entitled to a return of its lease bonus. *See* LA. REV. STAT. § 31:120 ("A mineral lessor impliedly warrants title to the interest leased unless such warranty is expressly excluded or limited."). We affirm the district court's judgment dismissing with prejudice Petrohawk's counterclaim for the return of the lease bonus.

*E. Chesapeake's Claim for Intentional Interference With a Contract*

In its cross-appeal, Chesapeake argues that the district court incorrectly dismissed its Louisiana state-law claim against Petrohawk for intentional interference with a contract. Chesapeake asserts that Louisiana caselaw allows an intentional interference with a contract claim where a defendant owes a duty to the plaintiff, and that Petrohawk owed a duty to Chesapeake here. Petrohawk argues that a Louisiana state-law claim for intentional interference with a contract can only be asserted against an officer of a private corporation and cannot be asserted against a corporate entity defendant. We review de novo the district court's legal conclusion that Chesapeake's claim is not a viable cause of action under Louisiana law. *See Dickerson*, 556 F.3d at 294.

In 1989, the Louisiana Supreme Court first recognized the cause of action for intentional interference with a contract in *9 to 5 Fashions, Inc. v. Spurney*, 538 So. 2d 228, 232-34 (La. 1989). However, the cause of action that the state's highest court recognized was extremely limited. The court expressly refused to adopt the broad common law doctrine of interference with a contract, because it is "a rather broad and undefined tort in which no specific conduct is proscribed

and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way." *Id.* at 234 (quoting W. PROSSER & P. KEETON, THE LAW OF TORTS § 129, p. 979 (5th ed. 1984)) (internal quotation marks omitted). The court recognized "only a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person." *Id.* The court laid out the elements of this cause of action:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*Id.* The Louisiana Supreme Court has not addressed the scope of this cause of action since its decision in *9 to 5.*

We have acknowledged the limited nature of Louisiana's claim for tortious interference with a contract. In *American Waste & Pollution Control Co. v. Browning-Ferris, Inc.*, 949 F.2d 1384 (5th Cir. 1991), we noted that the *9 to 5* court created a narrow cause of action, but "did not expressly preclude a cause of action . . . based on other facts." *Id.* at 1387-88. We noted that the "common thread in [*9 to 5*] and its progeny is the requisite duty, or obligation, for such a cause of action." *Id.* at 1390. "[W]hether a duty exists is a question of law," and in *9 to 5*, the requisite duty "arose out of a corporate officer's *narrowly defined duty* to those with whom his corporation contracts." *Id.* (emphasis added). In *American Waste*, the plaintiff alleged that the defendant had knowledge of the plaintiff's contract with another party, and the defendant improperly induced the party to repudiate its contract with the plaintiff. *Id.* at 1385. However, we concluded that because the defendant "had no relationship" with the plaintiff,

the requisite duty was lacking. *Id.* at 1390. Given the absence of such a duty, we made the *Erie*-guess that the Louisiana Supreme Court would dismiss the plaintiff's intentional interference with a contract claim. *Id.* at 1390-91.

In *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453 (5th Cir. 1999), we again "recognized the narrowness of Louisiana's tortious interference action," and stated that "even the Louisiana appellate courts purporting to 'expand' the cause of action have done so within the limited confines of *9 to 5*." *Id.* at 457 (citations omitted). We concluded that the plaintiffs "failed to identify an *individualized duty* existing between themselves and their alleged tortfeasors that could give rise to the type of delictual liability established by the Louisiana Supreme Court in *9 to 5*." *Id.* (emphasis added).

The Louisiana courts of appeal have conformed to the limited cause of action expressed in *9 to 5*. *See, e.g.*, *Brown v. Romero*, 922 So. 2d 742, 747 (La. Ct. App. 2006); *Tallo v. Stroh Brewery Co.*, 544 So. 2d 452, 453-55 (La. Ct. App. 1989). In *Technical Control Systems, Inc. v. Green*, 809 So. 2d 1204 (La. Ct. App. 2002), the plaintiff urged the state appellate court to expand the holding of *9 to 5* "to allow a cause of action against a corporate entity defendant." *Id.* at 1207. The court concluded that, because "recent attempts by this court to expand upon this [cause of action] have been reversed by our supreme court," the court "must assume that [its] expansive take on a tortious interference with contract claim did not meet the approval of the supreme court." *Id.* at 1208-09 (citing *Cowen v. Steiner*, 689 So. 2d 516 (La. Ct. App. 1997), *rev'd* 701 So. 2d 140 (La. 1997)). Thus, the state appellate court affirmed the dismissal of the claim. *Id.* at 1209.

Where the Louisiana appellate courts have found a viable cause of action for tortious interference with a contract, the courts have identified a narrow, individualized duty between the plaintiff and the alleged tortfeasor. *See Neel v. Citrus Lands of La., Inc.*, 629 So. 2d 1299, 1301 (La. Ct. App. 1993) (stating that, "[i]f Mr. Neel can establish that Citrus Lands had a duty to allow him to go on

the land leased to EuroAmerican," then he could bring a viable tortious interference with a contract claim); *see also MD Care, Inc. v. Angelo*, 672 So. 2d 969, 973 (La. Ct. App. 1996) ("[T]he determinative factor . . . was whether the defendant owed the plaintiff a duty, the breach of which might constitute intentional interference with a contract.").

Based on this caselaw, *9 to 5* requires that the defendant owe a duty to the plaintiff in order for the plaintiff to have a viable claim for tortious interference with a contract. Thus, we must address whether Petrohawk owed a duty to Chesapeake. Chesapeake argues that Petrohawk owed it three duties: (1) a duty not to engage in unfair business practices pursuant to the Louisiana Unfair Trade Practices Act ("LUPTA");[6] (2) a general duty under public policy not to induce the Stockmans to break their contract; and (3) a duty not to commit fraud on the public record by recording a fraudulently acquired document.

We conclude that Chesapeake's arguments are without merit, as Chesapeake has failed to identify a narrow, individualized duty that Petrohawk owed Chesapeake. *See Egorov*, 183 F.3d at 457; *Am. Waste*, 949 F.2d at 1390. All three of the duties proposed by Chesapeake are broad, ill-defined duties. *See Angelo*, 672 So. 2d at 973 (noting that the "statutory definition of an unfair practice [under LUPTA] is broad and subjectively stated and does not specify particular violations") (citation omitted). Such broad, amorphous duties are not the kinds of duties encompassed by the court's decision in *9 to 5*. *See Egorov*, 183 F.3d at 457 n.2 (concluding that the general duties of Louisiana lawyers under the Louisiana Rules of Professional Conduct are not duties encompassed by *9 to 5*); *see also Am. Waste*, 949 F.2d at 1390. Indeed, the *9 to 5* court explicitly refused to adopt "a rather broad and undefined tort in which no specific conduct

---

[6] Under LUPTA, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are deemed unlawful. LA. REV. STAT. ANN. § 51:1405(A).

is proscribed." 538 So. 2d at 234 (citation and internal quotation marks omitted). "[I]t is not for this diversity court to expand [the] cause of action in the face of Louisiana's expressed unwillingness to do so." *Am. Waste*, 949 F.2d at 1391. In making our *Erie*-guess, we conclude that the Louisiana Supreme Court would hold that Chesapeake does not have a viable claim against Petrohawk for tortious interference with a contract.

Chesapeake alternatively asks us to certify this issue to the Louisiana Supreme Court pursuant to Rule 12 of the Rules of the Louisiana Supreme Court. Rule 12 provides that an issue may be certified when "there are no clear controlling precedents" from the Louisiana Supreme Court. Here, the Louisiana Supreme Court has issued *9 to 5*, a controlling opinion on the scope of the action for tortious interference with a contract. Thus, we decline to certify this issue. *See Am. Waste*, 949 F.2d at 1392. For the reasons stated above, we affirm the district court's judgment dismissing with prejudice Chesapeake's intentional interference with a contract claim.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.