# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-30680

United States Court of Appeals
Fifth Circuit

**FILED**
April 18, 2014

Lyle W. Cayce
Clerk

AMERIMEX RECYCLING, L.L.C.,

Plaintiff–Appellee

v.

PPG INDUSTRIES, INCORPORATED,

Defendant–Appellant

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:07-CV-2090

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PER CURIAM:*

Plaintiff–Appellee Amerimex Recycling, L.L.C. ("Amerimex") brought the underlying action against Defendant–Appellant PPG Industries, Inc. ("PPG") seeking monetary damages for an alleged wrongful termination of a contract between the two parties. Following a bench trial, the district court found that PPG breached its contract with Amerimex and awarded $319,255.00 in damages to Amerimex, together with judicial interest and costs. We affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-30680

## I.    FACTS AND PROCEEDINGS

PPG operates a metal scrap yard and sells surplus scrap metal as part of its disposal process.  Amerimex is a scrap metal recycler and purchases discarded metals at a reduced rate.

On August 19, 2005, PPG and Amerimex entered into a written three-year contract for the purchase of scrap metal (the "Contract").  The Contract is comprised of (1) a standard "Purchase Order" form (the "Purchase Order"), the back of which contains certain "Purchase Order General Conditions" (the "Purchase Order Conditions"), and (2) a set of "Surplus/Used Equipment Materials Sale - General Conditions" (the "Surplus Conditions").  The Contract authorized Amerimex to purchase "No. 2 Heavy Melt Scrap Steel and Scrap Crushed Drums" at a defined price from PPG.  Such steel is sometimes referred to as "scrap steel" or "ferrous" metal, as distinguished from more valuable "nonferrous" metals such as nickel, aluminum, brass, stainless steel, and copper.  The Contract also required Amerimex "to clean the scrap yard to bare ground during [certain] months."

Among other provisions, the Purchase Order Conditions provide for indemnification and cancellation.  Specifically, clause eleven provides for indemnification and states: "Seller agrees to indemnify, defend and hold harmless Buyer . . . from and against . . . any and all suits, causes of action and proceedings thereon arising or allegedly arising from or related to the subject matter of this Purchase Order."  Clause fourteen provides for cancellation and states: "Buyer reserves the right to cancel this Purchase Order, or any part thereof, at any time, without cause, by written notice to Seller."  On the Purchase Order, PPG signed the "Purchasing Agent" signature line and Amerimex signed the "Seller's Signature" line.  The parties dispute, however, which party constitutes the "Buyer" and which the "Seller" as used in the Purchase Order.

2

No. 13-30680

Similarly, the Surplus Conditions provide for a limitation on liability, indemnification, and cancellation. Clause one limits liability: "[The] limit of Seller's liability for any claim arising out of this transaction whether in contract, tort or strict liability shall be the invoice price of the particular shipment out of which the claim arises and in no event shall seller be liable for any special, indirect or consequential damages." Clause three provides for indemnification and states that "Buyer agrees to indemnify and save Seller" in certain situations. Finally, clause seven provides for cancellation and states: "Buyer's failure to satisfactorily comply with all the conditions of this Agreement shall entitle the Seller to cancel this Agreement without obligation by written notice to the Buyer." There is no dispute that, in the Surplus Conditions, "Seller" refers to PPG and "Buyer" refers to Amerimex.

The incident that precipitated PPG's termination of the Contract occurred on October 31, 2006. According to PPG, its employees witnessed Amerimex employees load nonferrous metals onto an Amerimex trailer. The PPG employees notified their supervisor, Greg Trahan ("Trahan"), who subsequently called PPG's contract security service. PPG's security advisor did not permit Amerimex to leave the facility and contacted the local sheriff's office, who then questioned the Amerimex employees. After this incident, PPG terminated its contract with Amerimex.

On October 29, 2007, Amerimex filed suit against PPG and Trahan in Louisiana state court alleging that PPG wrongfully terminated the Contract, falsely imprisoned its employees, and defamed Amerimex. Amerimex and Trahan are Louisiana citizens, whereas PPG is a foreign corporation. Pursuant to 28 U.S.C. §§ 1441 and 1446, PPG and Trahan removed the case to federal court on the basis of Trahan's improper joinder and complete diversity of citizenship. PPG then filed its answer denying liability and asserting

3

counterclaims for past-due accounts receivable and enforcement of Amerimex's indemnity obligations to PPG under the Contract.

All parties consented to proceed before a United States magistrate judge. After receiving no objection from Amerimex, the district court dismissed with prejudice all claims against Trahan due to Amerimex's failure to state a cause of action against him. The court then granted PPG's motion for summary judgment as to Amerimex's false imprisonment and defamation claims, but denied the motion as to Amerimex's wrongful termination of contract claim and PPG's counterclaim for indemnification. The judgment did not address PPG's counterclaim for unpaid accounts receivable. Amerimex and PPG consented to have the matter tried without a jury, and trial commenced September 19, 2011.

Following the bench trial, the court entered the following findings of facts and conclusions of law on May 17, 2013. The magistrate judge found that the contract period ran from August 22, 2005 through July 31, 2008, and that former PPG employee Jerry Boyles ("Boyles") and Amerimex co-owner Juan Cadena ("Cadena") signed the Contract. Additionally, Boyles testified that PPG drafted the contract in whole. According to the magistrate judge, however, "[t]rial testimony indicated that there were many details, customs, and practices between the parties that were omitted from the written agreement." The contract did not specify, for example, the location or process by which Amerimex would acquire the scrap steel.

In light of the omissions, the district court relied upon evidence of industry custom. Customarily, PPG would prepare a scrap metal pile in its yard for its scrap metal buyer. As scrap metal was once a part of something else, it would sometimes still be attached to other metals. Consequently, a scrap metal pile might include any combination of: (1) scrap metals that were essentially garbage, (2) scrap steel as identified in the Contract, and (3)

4

nonferrous metals with a higher value than the scrap steel. Potential scrap metal buyers typically viewed a scrap metal pile and bid on the contract to haul the pile out. Whereas previous scrap buyers would haul out the entire scrap metal pile and separate it later, Amerimex would customarily first separate a scrap metal pile into smaller piles of like kind, and remove a pile from PPG's yard when a sufficient amount accumulated. The court found that PPG had never objected to this process during the fourteen months Amerimex performed under the Contract.

On September 29, 2006, Trahan became the scrap yard supervisor and, as the district court noted, "[i]t was exceedingly clear . . . from testimony at trial that there existed considerable friction between Trahan and Cadena." In their first meeting, for example, Trahan admitted that he called Cadena a "smart ass" and testified that after the confrontation, he "didn't need Amerimex in the plant." Trahan further testified that he felt "uncomfortable" dealing with Cadena and, for this reason, he no longer communicated directly with Cadena.

Regarding the October 31, 2006 incident, the court found that Amerimex entered the PPG scrap yard and loaded one of its vehicles with metal from the scrap pile, including nonferrous metals. The court further found that, "[r]ather than approach the Amerimex employees and question them about their activities or indicate that they may have been doing something inappropriate," the PPG employees, including Trahan, informed their security supervisor that Amerimex was attempting to steal high-value metals. PPG's security personnel consequently stopped Amerimex's vehicle at the gate and contacted the local sheriff's office. The Amerimex employees were released after questioning, but the metal that Amerimex had loaded was not allowed to leave PPG's premises.

No. 13-30680

After PPG terminated its contract with Amerimex, PPG awarded the contract to another scrap buyer, Southern Scrap. Between January 2007 and July 31, 2008, Southern Scrap removed 8,168,360 pounds of metal from PPG's scrap yard, for which it paid PPG $549,679.65.

Turning to the Contract, the court interpreted it to require cause for termination and found that PPG did not have such cause. As to damages, the court projected Amerimex's net lost profits at $332,843.89, but found that Amerimex never paid PPG for the loads it removed during October 2006, which amounted to $13,588.89. The court further found that a liability-limitation clause did not limit Amerimex's damages, and that neither indemnification provision applied.

Accordingly, the court found that PPG breached its contract with Amerimex, and that, as a result, Amerimex sustained damages in the amount of $332,843.89. This amount was reduced by the $13,588.89 Amerimex owed to PPG for unpaid scrap. On June 14, 2013, the district court entered judgment finding PPG liable to Amerimex in the amount of $319,255.00 together with judicial interest and costs. PPG timely appealed.

## II.    JURISDICTION AND STANDARD OF REVIEW

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Because PPG seeks review of a final judgment of the district court, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

In an appeal from a final judgment following a bench trial, we review the district court's findings of fact for clear error, and conclusions of law and mixed questions of law and fact de novo. *French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2011) (citing *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009)). "'A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of

credible testimony.'" *French*, 637 F.3d at 577 (quoting *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009)).  "[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility," Fed. R. Civ. P. 52(a)(6), and should reverse "under the clearly erroneous standard 'only if [it has] a definite and firm conviction that a mistake has been committed,'" *French*, 637 F.3d at 577 (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000)).

The district court's interpretation of contracts is reviewed de novo, applying the same standards that guided the district court.  *Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 563 (5th Cir. 2000) (citing *Exxon Corp. v. Crosby–Miss. Res., Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998)).  But if the district court relied upon extrinsic evidence to interpret an ambiguous contract, then its factual findings concerning the parties' intent are reviewed for clear error.  *Preston Law Firm, L.L.C. v. Mariner Health Care Mgmt. Co.*, 622 F.3d 384, 392 (5th Cir. 2010).  However, "[t]he determination of whether a contract is clear or ambiguous is a question of law."  *Petrohawk Props., L.P. v. Chesapeake La., L.P.*, 689 F.3d 380, 393 (5th Cir. 2012) (quoting *Sims v. Mulhearn Funeral Home, Inc.*, 2007-0054, p.9 (La. 5/22/07); 956 So. 2d 583, 590).

## III.   DISCUSSION

PPG presents numerous issues on review, many without legal or factual support.  We first provide the applicable rules of construction.  Then we address issues raised relating to the district court's finding that PPG breached the Contract; next, those relating to damages; and finally, those relating to indemnification.

### A. Rules of Construction

State law rules of construction govern in diversity cases.  *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995).  Because this action was

filed in the U.S. District Court for the Western District of Louisiana, this Court is bound to apply the substantive law of the forum state of Louisiana. *See Am. Elec. Power Co.*, 556 F.3d at 285–86 n.2.

Under Louisiana law, the "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. If the terms of a contract are unambiguous—i.e., "clear and explicit and lead to no absurd consequences"—then "no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046. Conversely, "[a] contract is considered ambiguous on the issue of intent when it lacks a provision bearing on the issue, its written terms are susceptible to more than one interpretation, there is uncertainty as to its provisions, or the parties' intent cannot be ascertained from the language used." *Petrohawk Props., L.P.*, 689 F.3d at 393 (citation and internal quotation marks omitted). In that event, the court may consider extrinsic evidence to determine the parties' intent. *Id.*

The Louisiana Supreme Court has summarized Louisiana's general principles of contract interpretation as follows:

> Contracts have the effect of law for the parties and the [i]nterpretation of a contract is the determination of the common intent of the parties. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract. Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties. However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Most importantly, a contract must be

interpreted in a common-sense fashion, according to the words of the contract their common and usual significance. Moreover, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

. . . .

. . . [W]hen the printed contract provisions irreconcilably conflict with the provisions added by the parties, the added provisions will control.

*Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 2012-2055, pp. 5–6, 7 (La. 3/19/13); 112 So. 3d 187, 192, 193 (footnotes, citations and internal quotation marks omitted). Additionally, "[i]n case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." La. Civ. Code Ann. art. 2056.

**B. Breach of Contract**

PPG contends that it did not breach the contract because it could terminate the Contract without cause and that, were caused required, it nevertheless had cause. Amerimex responds that cause was required and that the district court did not clearly err in finding that PPG did not show cause. We hold that the Contract required PPG to establish cause to terminate, and that PPG did not do so.

1. <u>The Contract Required Cause to Terminate</u>

We review de novo the district court's finding that the Contract could not be terminated without cause. *See Musser Davis Land Co.*, 201 F.3d at 563.

9

No. 13-30680

PPG argues that clause fourteen[1] of the Purchase Order Conditions entitled it to terminate the Contract without cause and upon written notice. Clause fourteen of the Purchase Order Conditions, entitled "Cancellation," provides that the "Buyer reserves the right to cancel this Purchase Order, or any part thereof, at any time, without cause, by written notice to Seller." PPG contends that, as used in the Purchase Order, "Buyer" refers to PPG and "Seller" refers to Amerimex. Amerimex responds that it is the "Buyer" and that PPG is the "Seller" in both the Purchase Order Conditions and the Surplus Conditions.

On review, the language of the Contract reflects that the parties intended Amerimex to be the "Buyer" referred to in both the Purchase Order and the Surplus Conditions. The Purchase Order states that it was "issued to cover the sale . . . by PPG to Amerimex"; denotes "[t]he price to be paid to PPG"; and provides that "PPG shall bill the vendor monthly." Such language plainly encompasses a sale from PPG to Amerimex, with the price to be paid to PPG from Amerimex and as billed by PPG to Amerimex. Moreover, PPG does not dispute that clause seven of the Surplus Conditions, read alone, requires it to establish cause to cancel the Contract. Yet, to accept PPG's argument—that clause fourteen of the Purchase Order allows it to terminate without cause— would render clause seven meaningless. *See Clovelly Oil Co.*, 112 So. 3d at 192 (stating that "[e]ach provision in a contract must be interpreted in light of the other provisions" and that the court should not construe the contract in a manner that leads to "absurd consequences").

To be sure, PPG notes that Cadena, Amerimex's principal, signed the Acknowledgment Copy of each Purchase Order on the line designated for the "Seller's Signature" and that PPG's representative signed the "Purchasing Agent" line. But, this is not dispositive. At best, the signatures would render

---

[1] In its brief, PPG refers to "clause 19," but this appears to have been a mistake.

10

No. 13-30680

clause fourteen ambiguous in light of the plain language of the Purchase Order and the existence of clause seven of the Surplus Conditions. Such ambiguity must be resolved against PPG, the drafter of the Contract. *See* La. Civ. Code Ann. art. 2056. Either way, clause fourteen of the Purchase Order did not allow PPG to terminate the Contract without cause. Instead, clause seven of the Surplus Conditions required cause for PPG to terminate the Contract, and the district court did not err in so finding.

2. PPG Did Not Establish Cause to Terminate

The district court's interpretation of the contract based on custom is reviewed for clear error. *See Preston Law Firm*, 622 F.3d at 392. Likewise, its ultimate determination that PPG breached the contract for lack of cause to terminate is a finding of fact that is reviewed for clear error. *See Flint Hills Res. LP v. JAG Energy, Inc.*, 559 F.3d 373, 375 (5th Cir. 2009). Here, the district court concluded that PPG did not have cause to terminate the contract because custom allowed Amerimex to take the nonferrous metals included in the scrap metal piles.

Neither party appears to dispute that the Contract lacks a provision and is ambiguous as to how Amerimex should process the higher valued nonferrous metals that may be included in a scrap pile. Indeed, as the district court noted, the Contract does not detail "how or in what manner Amerimex would come into contact with the metals it was allowed to remove or what procedure it was to use to separate out anything that did not qualify as 'No. 2 heavy melt scrap and crushed drums.'" The district court thus turned to extrinsic evidence, and found that:

> The uncontested evidence offered at trial was that PPG created a scrap pile in its yard that was *mostly* [scrap steel] to be disposed of by Amerimex. It is also uncontested that routinely PPG would inspect the piles and remove from them items such as high quality metals inadvertently placed there.

11

. . . .

Amerimex was to remove all materials left in the scrap pile. In fact, the contract requires that Amerimex "clean the scrap yard to bare ground." On occasion Amerimex would notice items, more valuable than [scrap steel] and would notify PPG. PPG would then reclaim these items. PPG never contracted to have Amerimex sort through the scrap pile. . . . Further, the evidence adduced at trial clearly indicated that it was the customary practice of PPG's scrap metal buyers, before, after, and during Amerimex's contract to take everything in the scrap metal pile. PPG employees testified that scrap buyers before Amerimex would use large mechanical arms to indiscriminately grab portions of the scrap pile to load into their trucks for hauling out. PPG knew of this practice and knew that pieces of high value metal would be taken along with the [scrap steel].

PPG does not argue that the district court clearly erred in any one of these factual findings.

PPG argues instead that it had sufficient cause to terminate the contract because Amerimex took high-value metals that Amerimex knew it was not supposed to, and failed to "clean the scrap yard to bare ground" as required under the Contract. Amerimex responds that the only cause cited in the termination notice was Amerimex's attempted removal of high-value metal on October 31, 2006. Custom and PPG's contract, Amerimex continues, permitted the attempted removal. We agree and find substantial evidence in the record to support the district court's finding that custom permitted Amerimex to take the entire scrap pile, including any nonferrous metals in the pile.

To begin, the record shows that PPG's custom was to make a scrap pile for the scrap buyer. The pile invariably contained metals other than scrap steel, including nonferrous metals. Cadena testified that, when he worked at Southern Scrap on its PPG contract, "[t]he pile was bidded out as is . . . . And then you would go in there and just pick everything up [because] it wasn't feasible for anybody to sit there and separate all that." Cadena further

testified that when he worked at Calcasieu Recycling, another scrap steel buyer, their procedure was to take from PPG the entire pile, including nonferrous metals.

PPG's own employees testified to the same effect. Andrew Guidry ("Guidry"), the supervisor prior to Trahan, agreed that "contractors prior to Amerimex [were] of the custom of coming in with their equipment [and] picking up whatever was in [the scrap] pile and taking it out of PPG's facility." Guidry testified that the prior contractors would use a "large grab arm [to] pick [up the scrap] and put it in the trailer" and agreed that the contractors would "grab whatever they could in [the scrap] pile and throw it in their truck," including "metal other than No. 2 heavy melt." James Gregory Arceneaux ("Arceneaux"), a laborer in PPG's scrap yard, agreed that Southern Scrap, before and after Amerimex had the contract, "grabbed whatever was in the pile" even if "it was [a nonferrous metal]" and "left the plant."

Such testimony from Cadena, Guidry, and Arceneaux supports the district court's finding that the scrap pile buyer customarily took everything in the scrap pile, including nonferrous metals. Indeed, the contract required Amerimex to "clean the scrap yard to bare ground." In view of the record as a whole, PPG's citation to two statements from Cadena's testimony—purportedly reflecting his knowledge that he was not to take nonferrous metals—does not evince "a definite and firm conviction that a mistake has been committed." *See French*, 637 F.3d at 577 (internal quotation marks omitted); *see also* Fed. R. Civ. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

Accordingly, the district court did not clearly err when it found that that custom permitted Amerimex to remove the entire scrap metal pile, including nonferrous metals. The district court properly found that PPG did not have cause to terminate the Contract.

**C. Damages**

Where the district court has not committed a legal error, "this court reviews the district court's award of damages for clear error only. If the award of damages is plausible in light of the record, a reviewing court should not reverse the award even if it might have come to a different conclusion." *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 447 (5th Cir. 2002) (footnotes and internal quotation marks omitted).

The district court found that, "[d]ue to the many variables, such as the various types of metals at issue, uncertain amounts, and fluctuating values, a precise measure of damages owed to Amerimex cannot be calculated with mathematical certainty." In light of such uncertainty, the district court correctly cited La. Civ. Code Ann. art. 1999 in noting that, "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." The district court therefore calculated Amerimex's lost profits based upon Amerimex's historical performance under the Contract in the 2006 fiscal year, because 2006 was the only full year during which Amerimex performed under the Contract. Based on Amerimex's 2006 tax return, the district court calculated Amerimex's 2006 cost of goods sold to gross sales ratio ("COGS-to-Sales ratio") to be 50.7%, and its expense to gross sales ratio ("Expense-to-Sales ratio") to be approximately 18.6%. To project the quantity and COGS that Amerimex would have removed during the unexpired portion of the Contract, the court considered the quantity of scrap that Amerimex's successor, Southern Scrap, removed in that period. During that time period, Southern Scrap had hauled 8,168,360 pounds of scrap metal, for which it paid PPG $549,679.65.

Projecting Southern Scrap's $549,679.65 COGS as Amerimex's own COGS during the same period, the district court calculated Amerimex's lost profits utilizing its historical COGS-to-Sales and Expense-to-Sales ratios.

No. 13-30680

First, Amerimex's gross sales were projected by dividing the estimated COGS, or $549,679.65, by the COGS-to-Sales ratio of 50.7%. This projected gross sales to be $1,084,180.77. Next, the COGS was subtracted from gross sales to derive gross profit of $534,501.12. Third, the district court multiplied gross sales by the Expense-to-Sales ratio to produce estimated expenses of $201,657.62. Projected net profits for that time period would then be gross profits less expenses, or $332,843.89. The district court reduced this amount by the sum owed to PPG by Amerimex for unpaid scrap, $13,588.89. Thus, the court awarded Amerimex $319,255.00 together with judicial interest and costs.

PPG challenges the district court's damages award on a number of grounds. First, PPG disagrees with the court's evidentiary basis for the damages figure. Second, PPG contends that its liability is limited under the Contract. Third, PPG briefly mentions a hodgepodge of arguments to otherwise preclude or offset the award. Finally, PPG challenges the court's prejudgment interest award. Because the award of damages is plausible in the light of the record, we reject each attempted challenge.

1. Evidentiary Basis for Damages

PPG raises multiple challenges to the baseline figures the district court used to arrive at its award of $319,255.00 in lost-profit damages.[2] First, the bulk of PPG's challenge relies upon its assertion that, had PPG stopped Amerimex from taking the more valuable nonferrous metals during the damages period, then Amerimex would have actually generated a net loss on

---

[2] PPG also argues that "[t]he magistrate should have granted PPG's motion in limine and trial objections excluding Amerimex's speculative lay testimony on lost profits and should have denied any award of damages to Amerimex." PPG, however, does not specify what lay testimony the magistrate judge relied upon that PPG believes is speculative. Accordingly, this argument is waived. *See, e.g.*, *In re Repine*, 536 F.3d 512, 518 n.5 (5th Cir. 2008) (finding argument waived "due to inadequate briefing" where appellant "fail[ed] to explain" the argument and did not "cite any authority to support her position" (citing *L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 (5th Cir. 1994))).

the Contract.  Second, PPG contends that Amerimex, in light of its historical performance and limited machinery and employees, could not have removed as much scrap as Southern Scrap, and even if Amerimex could, there was no evidence that Amerimex would have in fact done so.  Finally, PPG takes issue with the historical ratios that the district court used, asserting instead that the district court should have used a Profit-to-COGS ratio.  According to PPG, the Profit-to-COGS ratio was 17.22% for the fourteen months Amerimex performed the Contract, whereas the Profit-to-COGS ratio of the damages awarded amounted to 97.21%.

None of PPG's arguments demonstrate that the district court's damages award was not plausible in light of the record.  PPG's first argument is wholly speculative, asserting in its brief that "Trahan certainly could and would have exercised his and PPG's right to stop that practice, limiting Amerimex to the money-losing proposition actually provided in the contract."  As its only evidence, PPG quotes the magistrate judge's comment that PPG could have told Amerimex "we need to redo the way we've been doing this," and misleadingly attempts to construe it as, in PPG's words, the court's "acknowledg[ment] that PPG could certainly have required Amerimex to abide by the actual terms of the contract."  The court, however, made its comment in urging the parties to "explore informal resolution," and stated simply that "this whole thing could have been avoided if somebody at PPG would have just sat Mr. Cadena down . . . and said: You know what, we need to redo the way we've been doing this."  This does not amount to evidence that PPG "certainly could have and would have" stopped Amerimex from taking the higher value metals.  To the contrary, as the district court did in fact find, custom allowed Amerimex to take everything in the scrap pile.  *See supra* Part III(B)(2).

As to PPG's second argument, the district court squarely addressed Amerimex's historical performance and capacity to remove steel, and we reject

PPG's position for the same reasons the district court cited.  First, Amerimex's historical performance is not representative of its potential capacity because the scrap pile at PPG grew substantially around the time Amerimex was terminated.    Second,  evidence  demonstrated  that  Amerimex  ordered additional equipment in response to the increased supply of scrap.  Although PPG appears to dispute the date when such equipment was ordered, PPG does not explain the relevance of the disputed date.    Finally, had PPG not terminated the Contract, Amerimex would have had two months more than Southern Scrap to clear the scrap.  PPG does not argue, nor does it offer any evidence to show, that any of these findings rebutting PPG's position were clearly erroneous.

Similarly lacking in support is PPG's argument that there is "no basis to assume Amerimex *would* have performed as Southern Scrap did."   PPG contends that testimony "shows [Amerimex] was not even fully devoting the extremely limited manpower it did have to trying to fulfill [the Contract]." Even if Amerimex did not "fully" devote its manpower in the past, however, PPG does not contend that Amerimex would have had to fully devote its manpower to remove as much scrap as Southern Scrap did.  On the contrary, as Amerimex points out, Cadena testified that he could have hired additional lay laborers to pick up that amount of metal.

Finally, as to PPG's proffered Profit-to-Sales ratio, PPG admits that it omitted the cost of six loads because "Amerimex provided no proof of how much Amerimex received on resale of these loads, and therefore no proof of any profit from  these  loads,"  and  because  there  was  no  evidence  that  "the  six 'unaccounted' loads from PPG were in fact materials purchased from PPG."  On the  record  as  a  whole,  the  district  court  plausibly  rejected  both  of  these assertions.

No. 13-30680

As to the amount Amerimex received on resale of the six unaccounted loads, Amerimex asserts that the six unaccounted loads collected from PPG correspond to three sales of nonferrous metals that were close in time to the collection dates of the six unaccounted loads. PPG responds that the three sales do not correspond to the six unaccounted loads because the weights do not match. Combined, the three sales amounted to 50,120 pounds of metal and allegedly reflects the sale of the six unaccounted loads, which totaled 40,610 pounds. This 19% difference does not appear insubstantial, even considering that the excess metal sold may have come from previous collections. Nevertheless, as the district court noted and PPG does not dispute, because "a precise measure of damages owed to Amerimex cannot be calculated with mathematical certainty," "much discretion shall be left to the court for the reasonable assessment of these damages" (quoting La. Civ. Code Ann. art. 1999). In light of this discretion, there was enough correlation between the weights and dates of the six unaccounted loads and three sales for the district court to plausibly reject PPG's attempt to wholly exclude the six loads and instead find that those three sales accounted for, at least in part, the six loads.

Moreover, the evidence plausibly demonstrates that Amerimex received from PPG most, if not all, of its nonferrous metals comprising the six unaccounted loads. Although Katie Cadena, an Amerimex employee, testified that one could not "exactly" tell how much nonferrous metal sold by Amerimex came from PPG, Minerva Cadena ("Minerva"), who owns the majority of Amerimex, testified that Amerimex received most, if not all, of its nonferrous metals from PPG. Specifically, Minerva testified that Amerimex was not in the business of buying and selling nonferrous metals prior to the contract with PPG, and that Amerimex "started getting [nonferrous metals] when we started [the Contract] with PPG. We might have had a little bit of [nonferrous metals before PPG] here and there, but really I don't remember any large amounts

18

coming in." When asked instead whether she "remember[ed] large amounts [of nonferrous metals] coming in from PPG," Minerva responded yes. Moreover, when asked if there was any "other vendor from whom y'all would acquire [nonferrous metals] in the 2005, 2006 period," Minerva answered no.

Based on the evidence that Amerimex attained most, if not all, of its nonferrous metals from PPG, and the evidence that tended to show some correlation between the six unaccounted loads and the three sales, the district court plausibly rejected PPG's complete omission of those six loads and instead included the six unaccounted loads in calculating damages.

2. Liability-Limitation Clause

We review de novo the district court's finding that clause one of the Surplus Conditions did not limit Amerimex's damages. *See Musser Davis Land Co.*, 201 F.3d at 563. PPG argues that the lost-profit damages the district court awarded constitute special, indirect, and consequential damages, which clause one of the Surplus Conditions precluded. Clause one provides, in relevant part:

> The limit of Seller's liability for any claim arising out of this transaction whether in contract, tort or strict liability shall be the invoice price of the particular shipment out of which the claim arises and in no event shall seller be liable for any special, indirect or consequential damages.

PPG alternatively relies on clause one to limit the damages to "the invoice price of the particular shipment out of which the claims arises," which PPG alleges is the October 31, 2006 shipment totaling $1,033.15. Amerimex contends that this liability-limitation clause does not apply to the underlying action because clause one attempts to limit liability for damage claims arising from "particular loads of scrap metal." In contrast, the underlying action did not make a claim as to the quality of goods or to a particular shipment, but instead made a claim as to PPG's premature termination of the Contract as a whole.

We decline PPG's invitation to broadly construe clause one as a limit on liability as to all claims arising out of the Contract. Clause one is narrower than PPG suggests and is limited to particular loads. As the district court reasoned, clause one is comprised of two sentences: the first "clearly disclaims all warranties of the product that PPG is selling," and the second, quoted above, "limits the remedies available to Amerimex [to] claims arising from a particular shipment [but] does not necessarily apply to claims arising out of a breach of the contract as a whole." Construed in this manner, clause one cannot be read to apply here, where the underlying claims arose out of PPG's premature termination of the Contract as a whole, not out of a particular transaction.

Even if this construction were not the clear intent of the parties, clause one is at least ambiguous because it may be subject to two reasonable interpretations: narrowly, as found here, or broadly, as PPG suggests. Because clause one is part of a standard form PPG drafted, the ambiguity must be resolved against the drafter and in favor of Amerimex. *See* La. Civ. Code Ann. art. 2056. The district court did not err when it found that clause one did not limit PPG's liability in this action.

3. <u>Additional Offsets to Damages</u>

PPG attempts to preclude or limit the damages award on a number of other grounds. First, PPG argues that the available remedy of specific performance precluded damages. Second, PPG contends that the district court should have accounted for work that Amerimex took on after the termination of the Contract or, alternatively, that Amerimex failed to mitigate its damages. Finally, PPG argues that it cannot be held liable for Trahan's personal misconduct. Each argument lacks merit.

No. 13-30680

### a. *Specific Performance*

PPG argues that if specific performance is available as a remedy for breach of contract of an obligation to deliver an item, then Louisiana law precludes the remedy of damages. In support, it cites La. Civ. Code Ann. art. 1986, and *Lombardo v. Deshotel*, 94-1172, p. 6 (La. 11/30/94); 647 So. 2d 1086, 1090. In PPG's view, it could have continued delivering scrap and steel drums to Amerimex under the Contract, thereby precluding the district court's damages award.

Amerimex responds that, as explained in comment (a) to the article, Article 1986 gives the obligee the option of requiring specific performance, but does not mandate it. Further, Amerimex contends that PPG waived this argument because it is an affirmative defense that PPG did not plead. Finally, Amerimex asserts that specific performance is impossible because the amount of metals and allocation of higher value metals were not defined in the contract and PPG had already hired a contractor who removed over two million pounds of the existing scrap.

PPG replies that comment (a) to Article 1986 cited a Louisiana Supreme Court case, *Girault v. Feucht*, 117 La. 276, 41 So. 572 (1906), which itself interpreted former Articles 1926 and 1927 and "allowed the plaintiff to obtain specific performance." In contrast, according to PPG, "present La. C.C. Art. 1986 allows *only* specific performance as a remedy for the type of breach alleged by Amerimex, unless 'specific performance is impracticable.'"

We reject PPG's argument. While comment (a) does cite *Girault* and its interpretation of former Articles 1926 and 1927, comment (a) states: "This Article is new, but it does not change the law. It restates a principle contained in C.C. Arts. 1909, 1926, and 1927 (1870)." La. Civ. Code Ann. art. 1986, cmt. (a). Moreover, in flat contradiction to PPG's assertion, present Article 1986 provides that "the court shall grant specific performance plus damages for

21

delay *if the obligee so demands*." La. Civ. Code Ann. art. 1986 (emphasis added). PPG's citation notwithstanding, *Lombardo* actually confirms that the obligee has the *option* to demand specific performance. *Lombardo*, 647 So. 2d at 1090 (citing La. Civ. Code Ann. art. 1986) (stating that the obligee has the "*right* to exact, insofar as practicable, specific performance" (emphasis added)); *see also Ogea v. Merritt*, 2013-1085, p.21 n.11 (La. 12/10/13); 130 So. 3d 888, 902 n.11 ("[I]n a civil case, an aggrieved party may prefer specific performance of an obligation rather than the payment of money." (citing La. Civ. Code Ann. art. 1986)). In other words, Amerimex had the option of demanding specific performance, but was not required to do so. Accordingly, whether or not specific performance was an available remedy, Article 1986 does not preclude Amerimex's damages.

### b. *Mitigation*

PPG argues, on the one hand, that the magistrate failed to account for "more lucrative nonferrous business" that Amerimex turned to after the termination of the Contract. On the other hand, PPG suggests that "[i]f . . . Amerimex had not sought other business to replace the lost PPG business," then the damages award should be reduced for Amerimex's failure to mitigate damages. Thus, PPG continues, Amerimex should only be entitled to damages for a period reasonably necessary to secure replacement business, "at most perhaps a month or two."

PPG cites no legal authority to support its argument that the magistrate judge should have accounted for the nonferrous metal business that Amerimex allegedly turned its resources to. PPG's factual support is equally lacking. There is no evidence that Amerimex was able to shift its resources from working on the Contract to other work. At best, PPG's citations to the record demonstrate that only one laborer was able to find work in Amerimex's nonferrous business. There were, however, at least two other laborers on the

22

Contract, and PPG cites no evidence that they also switched to Amerimex's nonferrous business. In fact, Cadena testified that the laborers worked "full time" only in the sense that "they were on salary," but that he "had to pay them [their full-time salaries]" even though "[i]t was very hard to keep them busy."

In the alternative, PPG speculates that "if" Amerimex had not sought other business, then the damages period should be "perhaps a month or two." Beyond this speculation, PPG makes no argument that Amerimex actually failed to mitigate its damages. Mere speculation will not satisfy PPG's burden to prove that Amerimex did not make reasonable efforts to mitigate damages. *See Brassette v. Exnicios*, 2011-1439, p. 10 (La. App. 1 Cir. 5/14/12); 92 So. 3d 1077, 1083–84 (stating that "[a]n obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform" and that "the burden of proof is on the party asserting the [affirmative] defense [of a failure to mitigate damages]" (quoting *MB Indus., LLC v. CNA Ins. Co.*, 2011-0303, p. 10 (La. 10/25/11); 74 So. 3d 1173, 1180–81)).

### c. *Trahan's Misconduct*

PPG argues that the district court could not hold PPG liable "based on Trahan's alleged conduct" when the district court had found "'no possibility of recovery' against Trahan himself." PPG offers no legal authority in support and no citations to the record suggesting that the district court held PPG responsible for Trahan's personal misconduct. PPG has waived this argument. *See, e.g.*, *In re Repine*, 536 F.3d at 518 n.5.

### 4. <u>Interest on Damages</u>

PPG argues that circuit precedent permitting the award of prejudgment interest under state law—*see, e.g.*, *Bost. Old Colony Ins. Co. v. Tiner Assocs.*, 288 F.3d 222, 233–34 (5th Cir. 2002)—is contrary to the language of 28 U.S.C. § 1961 and Federal Rule of Appellate Procedure 37, and should be overruled. However, PPG fails to explain the manner in which circuit precedent is

contrary to section 1961 and Rule 37, and offers no other argument or legal authority in support.  Nor does PPG argue that there has been an intervening change in law that would permit this panel to decline to follow the precedent PPG cites.  *See, e.g.*, *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court." (citation omitted)).  Because of this inadequate briefing, PPG has waived this argument.  *See, e.g.*, *In re Repine*, 536 F.3d at 518 n.5.

In sum, the district court did not err in its damages award.

**D. Indemnification Clauses**

We review de novo the district court's construction of the Contract's indemnification clauses.  *See Musser Davis Land Co.*, 201 F.3d at 563.  PPG points to two indemnity provisions—clause eleven of the Purchase Order Conditions and clause three of the Surplus Conditions—to extinguish its liability for damages and to be awarded its costs in defending itself against the suit.  The district court found that neither clause indemnified PPG.

PPG's argument concerning clause eleven of the Purchase Order Conditions is quickly disposed of.  Clause eleven provides that "Seller agrees to indemnify . . . Buyer . . . from and against any and all damages."  As above, PPG is the "Seller" and Amerimex is the "Buyer." *See supra* Part III(B)(1).  Clause eleven therefore does not require Amerimex to indemnify PPG.

Nor does clause three of the Surplus Conditions require Amerimex to indemnify PPG.  It states in full:

> 3.  Indemnity:  Buyer agrees to indemnify and save Seller, its subsidiaries and affiliates, harmless from any and all judgments, orders, decrees, awards, costs, expenses, including attorneys' fees and claims on account of damage to property (including claims

under the Comprehensive Environmental Response, Compensation and Liability Act ["CERCLA"], the Resource Conservation and Recovery Act ["RCRA"] and similar federal, state or local laws) or personal injury (including death) which may be sustained by the Buyer, the Buyer's employees, or the Seller, or the Seller's employees, or third persons, and arising out of or in connection with this sale, or the use or handling of the equipment or material sold whether such loss, damage, injury or liability is contributed to by the negligence of Seller or its subsidiaries or affiliates or their employees (except that this indemnity shall not apply to damages, injuries or the cost incident thereto to the extent caused by the sole negligence of the Seller).

PPG cites *Wallace v. Shreve Memorial Library*, 79 F.3d 427, 429–30 (5th Cir. 1996), and *Anderson v. Orleans Parish School Board*, 340 F. Supp. 2d 716, 720 (E.D. La. 2004), for the proposition that "a contract with a definite term and terminable only for cause is a species of property." Therefore, PPG contends, the termination of the contract constitutes damage to its property. In response, Amerimex argues that the "general, plain and popular meaning of damage to property would be damage to our possessions, our car, our boat, our home and the like."

Neither *Wallace* nor *Anderson* support PPG's assertion that "a contract with a definite term and terminable only for cause is a species of property." Rather, those cases decided a different question: whether a plaintiff's public employment contract constituted a property interest warranting a pre-deprivation hearing under the Due Process Clause. *See Wallace*, 79 F.3d at 429; *Anderson*, 340 F. Supp. 2d at 719–20. PPG does not offer any explanation as to how such a "property interest," in the context of procedural due process, is applicable here. Indeed, PPG does not cite any evidence suggesting that the parties intended "property" to include intangible property interests as used in *Wallace* and *Anderson* or otherwise.

On the contrary, reading the clause as a whole, "property" plainly refers to tangible property.  For example, clause three includes as examples of "damages to property" CERCLA and RCRA, both of which are acts intended to combat damage to the environment—i.e., tangible property.  *See, e.g.*, 42 U.S.C. § 6902(a) ("The objectives of [the RCRA] are to promote the protection of health and the environment and to conserve valuable material and energy resources . . . ."); *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 289 (5th Cir. 2010) ("CERCLA is Congress's answer to the serious environmental and health risks posed by industrial pollution and was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." (footnotes and internal quotation marks omitted)).  Moreover, clause three applies only for damage "arising out of or in connection with this sale, or the use or handling of the equipment or material sold," further suggesting that the provision concerns damage to tangible property, e.g., equipment or material.

In any event, even if the Contract could reasonably be considered a "species of property," the Contract is ambiguous as to whether the term "property" in clause three refers to tangible property, intangible property interests, or both.  Given this ambiguity, clause three must be interpreted against the drafter, PPG.  *See* La. Civ. Code Ann. art. 2056.  Accordingly, the breach of contract claim here is not "damage to property" and, thus, clause three does not indemnify PPG in this case.

## IV.    CONCLUSION

For the reasons herein, we AFFIRM the district court in all respects.